[No. S152822. Oct. 30, 2008.]

In re CHARLISSE C., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
SHADONNA C., Defendant and Respondent;
CHILDREN'S LAW CENTER, Objector and Appellant.

**COUNSEL**

Akin Gump Strauss Hauer & Feld, Rex S. Heinke and Seth M.M. Stodder for Objector and Appellant.

Raymond G. Fortner, Jr., County Counsel, and Peter Ferrera, Assistant County Counsel, for Plaintiff and Respondent.

John L. Dodd, under appointment by the Supreme Court, for Defendant and Respondent.

John Cahill, under appointment by the Supreme Court, for Minor.

William Wesley Patton as Amicus Curiae.

**OPINION**

**CHIN, J.**—We granted review in this case to determine whether the juvenile court correctly disqualified the Children's Law Center of Los Angeles (CLC) from representing Charlisse C., a minor, in this dependency action. CLC is a publicly funded, nonprofit law office that represents parties in the Los Angeles County Juvenile Dependency Court. It currently comprises three units: a core unit, known as Unit 1, and two conflict units, known as Units 2 and 3. Unit 3 undertook to represent Charlisse in this action, which arose when a juvenile dependency petition was filed under Welfare and Institutions

Code section 300[1] alleging in part that Charlisse was at substantial risk of being abused or neglected due to the emotional and mental health problems of her mother, Shadonna C. Shadonna is a former client of CLC's Unit 1 (or its predecessor). Although finding no actual conflict of interest and no improper disclosure of confidential information, the juvenile court, citing *Castro v. Los Angeles County Bd. of Supervisors* (1991) 232 Cal.App.3d 1432 [284 Cal.Rptr. 154] (*Castro*) and *People v. Christian* (1996) 41 Cal.App.4th 986 [48 Cal.Rptr.2d 867] (*Christian*), found that an erosion of the ethical screens separating CLC's units created a structural conflict of interest warranting CLC's disqualification. In a divided decision, a majority of the Court of Appeal reversed the disqualification order. For reasons set forth below, we conclude the trial court applied the wrong legal standard in ordering CLC's disqualification and therefore abused its discretion. We remand the matter for further consideration in accordance with the standards this opinion sets forth.

FACTUAL BACKGROUND

On July 26, 2006, the Los Angeles County Department of Children and Family Services (DCFS) filed a petition alleging that six-day-old Charlisse came within the juvenile court's jurisdiction for two reasons: (1) she was at substantial risk of suffering serious physical harm because the "emotional/mental health condition" of her 19-year-old mother, Shadonna, "at times ha[d] interfered with [Shadonna's] ability to provide regular care, supervision and a home" (see § 300, subd. (b)); and (2) Charlisse's sister, Donna, had been abused or neglected by Shadonna and there was substantial risk that Charlisse would also be abused or neglected (see § 300, subd. (j)). Regarding the latter allegation, the petition explained that Donna, who was born when Shadonna was 14 years old, is a former juvenile court dependent and that the dependency ended with Donna's adoption by her grandmother. A simultaneously filed detention report noted that Shadonna is "a former foster youth" with a "history of behavioral problems."

At the detention hearing on July 26, 2006, the juvenile court appointed a CLC attorney to represent Charlisse. CLC is a publicly funded, nonprofit legal services organization that the County of Los Angeles created in 1989 to provide statutorily required legal representation to parents and children in the dependency court.[2] (*Castro, supra,* 232 Cal.App.3d at p. 1436.) It initially operated under a 1990 agreement with the Los Angeles County Board of Supervisors (Board) requiring CLC to maintain a structure that enabled it to "represent as many as three separate parties in a dependency proceeding, even if they [had] conflicting interests." (*Ibid.*) The 1990 agreement also

[1] All further unlabeled statutory references are to the Welfare and Institutions Code.

[2] CLC was initially called Dependency Court Legal Services, Inc. For simplicity, we will refer to it as CLC.

required CLC to follow specified operating rules and procedures, including the following: (1) CLC's staff attorneys had to "be organized into three separate offices of comparable quality," each with "its own separate administrator" with "full case management authority over all cases assigned to that office"; (2) "[e]ach office [had to] maintain separate case files," and staff attorneys assigned to one office could not "have access to the case files of [another] office"; (3) "[a]ttorneys [could] not be transferred between offices"; and (4) CLC "corporate officers [could] promote, discipline, or dismiss a staff attorney only upon the recommendation of that attorney's office administrator." In *Castro*, the Court of Appeal rejected the claim that CLC's separate offices could not represent separate parties with potentially adverse interests in a single dependency proceeding, reasoning in part that CLC had "been structured so its attorneys and its separate groups [had] no contact with one another," and that its "structures . . . reinforce[d]" the ethical duty of CLC's attorneys not to violate their clients' confidences or compromise their legal interests. (*Castro, supra*, 232 Cal.App.3d at p. 1442.)

In July 2005, CLC began providing legal services under an agreement with California's Administrative Office of the Courts. At about the same time, CLC reorganized its three offices into three litigation units: a "core" unit, known as Unit 1, and two "conflict" units, known as Units 2 and 3.

The CLC attorney the juvenile court appointed to represent Charlisse was with Unit 3. Shadonna, represented by a non-CLC attorney, objected to the appointment, asserting that she had been "a CLC client of [U]nit [1] when she was a child" and that a conflict of interest existed because, in light of CLC's structural changes, its three units were "operating as one firm." The court, noting that it had appointed Unit 3, rather than Unit 1, to represent Charlisse, found no "factual conflict," but left open the possibility that Shadonna could file a recusal motion and "make a record that, factually, the current structure of CLC violates" the structure *Castro* approved.

Three weeks later, Shadonna moved to disqualify CLC and Unit 3 from further representation of any party. In her moving papers, she asserted that she became a dependent child in December 2001 after her mother died, that CLC's Unit 1 represented her when she was a dependent child, that Unit 1 later represented her again as a parent when her first child was detained in June 2002, that she received reunification services through December 2003 in connection with her first child, and that her first child was adopted and jurisdiction was terminated in February 2005.[3] She then argued that because CLC's prior representation of her substantially related to CLC's current

---

[3] Shadonna did not submit a declaration regarding her former representation by CLC, arguing that the circumstances of that representation were "subject to judicial notice from the Court's own records." The juvenile court declined Shadonna's request for judicial notice of the

representation of Charlisse, disqualification was appropriate unless CLC showed that "it complie[d] with the structure set forth in *Castro*." She further argued that CLC's "current structure" did not comply with *Castro*, that "[t]here ha[d] been no attempt to maintain ethical walls among [CLC's] three units," and that the ability of CLC's administration "to dictate policy, hire, fire, set salaries, and interfere with the assignment of cases create[d] a de facto conflict of interest for every client with an adverse interest to another client within the organization."

In support of her motion, Shadonna submitted declarations from Kenneth Sherman, Anne Fragasso, Allen Korenstein, and Angela Pierce di Donato, all former CLC employees. Sherman joined CLC in 1990 as a senior trial attorney and, in September 1997, became director of the office now known as Unit 2. He stated generally that after Miriam Krinsky became CLC's executive director in April 2002, she "repeatedly violated the ethical walls" separating CLC's units.[4] Specifically, he stated:

1. In January 2003, Krinsky tried to convince him, one of his attorneys, and one of his supervisors to "quash" a subpoena for a DCFS employee in a case Sherman's office was handling, because Krinsky was concerned "it would not look good if it appeared that [CLC] was not cooperating with" DCFS.

2. In early 2003, Krinsky asked fact-specific questions of an attorney in Sherman's office who was representing a dependent child. It was clear from the nature of the questions that Krinsky knew many of the facts of the case. Sherman later discovered that the head of Unit 1 represented a sibling with a conflicting interest.

3. In June 2003, "it was discovered" that Krinsky "surreptitiously had [CLC's] computer administrator put her email address on each of the intraoffice confidential emails of the three law firms. These intraoffice email lists were intended to be distribution lists for the staff within each office in order to ensure that there was no breach of confidentiality when information about cases was transmitted within the office. . . . When [Krinsky] was informed of the breach of confidentiality and how this act could endanger the viability of the corporation, she relented and permitted the three firms to maintain intraoffice confidential email address lists."

4. In fall 2003, Krinsky imposed a policy requiring her approval before a Code of Civil Procedure section 170.6 affidavit of prejudice could be used on

relevant facts, finding it "unnecessary" to grant the request. Nevertheless, CLC does not contest Shadonna's factual assertions regarding its former representation of her.

[4] In December 2006, Krinsky resigned from her position as CLC's executive director.

a "blanket" basis or in a "class of cases" to disqualify a judicial officer. She suspended the policy about a year later when Sherman provided her with an opinion on the policy from an "ethics expert."

5. In spring 2005, when an attorney left Sherman's office, Krinsky transferred one of the former attorney's cases to Unit 1. Krinsky felt it was not necessary to provide the client with notice and an opportunity to be heard, or to obtain a court order permitting the substitution, because CLC was counsel for the children. More generally, Krinsky pursued transferring cases at will among the three firms.

6. Krinsky "indicated" to Sherman "[m]any times . . . that she felt that the interests of the organization as a whole [were] paramount to the interests of the law firms."

Fragasso was a CLC employee from 1999 until the middle of 2005. At some point, she was a director of one of CLC's three firms. Like Sherman, Fragasso discussed (1) the policy Krinsky instituted in 2003 regarding blanket disqualification of judges, (2) Krinsky's addition of herself in 2003 to each firm's intraoffice e-mail address list without informing the firm directors, and (3) Krinsky's view in 2005 that cases could be transferred to Unit 1 without giving clients notice and an opportunity to be heard or obtaining a court order. According to Fragasso, regarding the last issue, Krinsky stated that as executive director, she had authority "to create whatever structure" she deemed appropriate. Fragasso also stated that when she refused to transfer cases without speaking to her clients in confidence and obtaining both their approval and a court order, Krinsky removed her as a law firm director.

Korenstein worked for what is now CLC Unit 2 from May 2004 through March 2006. He stated that he had "witnessed the transfer of a CLC [Unit] 2 secretary to CLC [Unit] 1 without, to [his] knowledge any conflict checks and/or screens." He also stated that once, when he asked the head of his unit to "approve funding for an expert psychologist to review [a] case and possibly testify in court," Unit 2's head told him "to forward [the] request to" the "head of CLC [Unit] 1."

Di Donato was a Unit 2 attorney from December 1996 until January 2005. She stated that Krinsky came into her office one evening after entering Unit 2 through a locked door that was not open to the public. She told Krinsky she "was working on a difficult case that needed more attention." Krinsky asked questions "about the facts of the case," "the client," "what was going on in court," and "what work [di Donato] was doing on" the case. When di Donato decided to leave CLC in November 2004, she wanted to keep 15 cases. Krinsky said the cases belonged to CLC and that she would decide which

cases di Donato could take. After di Donato explained the facts of each case to Krinsky, Krinsky permitted di Donato to keep only two child clients.

With these declarations, Shadonna submitted a copy of the revised operating procedures CLC adopted in October 2005 (Revised Operating Procedures), which stated in relevant part: "1. CLC['s] staff will continue to be assigned by CLC's executive leadership to a core unit or such other conflict unit or units as CLC may choose to maintain over time (currently denoted as CLC [Units] 1, 2, and 3). The conflict unit or units will handle cases with siblings where conflicts of interest are present ('conflict cases')—to be denoted on CLC's file and records as conflict cases—as well as any other nonconflict cases that may previously or in the future be assigned to that unit. . . . Any determination that a conflict exists in a given case will be made only after consultation with, and approval by, a supervisor, as set forth in CLC's conflict policy. [¶] 2. Each of CLC's units will operate pursuant to the procedures set forth herein to ensure that ethical walls for handling conflict cases within CLC remain in place and are honored at all times. Any questions or concerns that these procedures do not adequately preserve the separateness of conflict cases or that these procedures are not being complied with shall be directed to CLC's Executive Director or the appropriate unit head. [¶] 3. Each CLC unit shall have a unit head. The conflict unit head(s) shall ensure that conflict case files and all confidential case information relating to conflict cases assigned to a given unit are maintained by that unit, remain separate from the case files and confidential case information of the core firm and any other conflict unit(s), and cannot be accessed by any staff outside the conflict unit. The conflict unit(s) head(s) and any other conflict unit supervisors shall supervise, direct and coordinate the day-to-day representation and case-related decision making in regard to conflict cases and conflict clients assigned to that unit and will be the final decision-maker in regard to those case-specific issues. [¶] 4. [CLC's] practice for promoting, terminating or disciplining CLC lawyers or staff members is unchanged. The CLC Executive Director or his or her designee will remain the final decision-maker after considering a recommendation from the unit head or supervisor of that staff member, along with the basis for that recommendation. In evaluating that recommendation, the CLC Executive Director will not have access to conflict unit case files, or any conflict unit client confidential information. [¶] 5. No attorney shall have access to the case files or confidential client information relating to any clients of other units in conflict with that attorney's clients. [¶] 6. Where no conflict of interest or ethical concerns exist, cases may be reassigned within CLC, and in particular from the conflict unit(s) to the core firm. [¶] 7. CLC's executive leadership shall be responsible for hiring and training staff attorneys and for assigning them, as appropriate and consistent with the Board's restructuring plan, to the core firm or conflict unit(s). All

attorneys and staff shall receive training regarding the necessity of maintaining client confidences. [¶] 8. CLC will continue to remain counsel for all clients assigned to CLC. To ensure that the appropriate staff member receives notices, pleadings, and other information relating to clients, individual attorneys within CLC will serve as the responsible attorney—the attorney of record—for cases assigned to that attorney. If those individual attorneys leave CLC's employ or change courtrooms or caseloads, a notice will be filed with the court and sent to all critical persons and entities, designating the new responsible attorney of record within CLC. As noted above, the conflict unit head(s) will maintain ultimate and final responsibility for the supervision, direction and coordination of case-related decision making in regard to conflict cases and conflict clients assigned to that unit and will be the final decision-maker in regard to those case-specific issues."

In opposition to the motion, CLC argued that Shadonna's evidentiary showing was insufficient to warrant disqualification and that CLC's structure and operating procedures closely complied with the standards set forth in *Castro* and several other decisions, including *Christian* and *City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839 [43 Cal.Rptr.3d 771, 135 P.3d 20] (*Cobra*). CLC submitted declarations from Krinsky explaining that when CLC shifted its focus from representing both parents and children to representing only children, its tripartite structure of three semiautonomous divisions became outdated and unnecessary. Thus, in early 2005, CLC's board of directors decided to begin " 'moving CLC to a unified and more cohesive organizational structure.' " The Revised Operating Procedures were later adopted to "implement" a "gradual shift . . . toward a more unified organizational structure with a 'core firm' and 'conflict units.' "

In her declarations, Krinsky stated that CLC strictly adhered to its Revised Operating Procedures and enforced existing ethical walls, and that she was unaware "of any material breaches" of CLC's Revised Operating Procedures, ethical walls, or conflicts policy. She denied that she or other executive officers, attorneys, or staff from Unit 1 had access to case files in Units 2 and 3; that Unit 1 leadership and attorneys had access to client confidential information relating to cases of Units 2 and 3; that she had ever used a key to access the office spaces of Units 2 and 3 or any confidential case files;[5] that she had received any confidential information relating to, or exercised any control over, this case; that she had ever "forced any CLC lawyer to discuss a conflict case or reveal client confidential information"; that CLC's "executive leadership" had any involvement in case-specific decisions of Units 2 and 3 or supervision of cases assigned to those units; or that attorneys working in Units 2 and 3 needed approval from her or from Unit 1 before paying ordinary trial expenses, such as the costs of retaining expert witnesses. She

---

[5] Krinsky stated she did "not know" whether she had a key to the offices of Units 2 and 3.

also stated that extraordinary expenses for Units 2 and 3 might need her approval in order to ensure that CLC operated within its budgetary limitations, but that in evaluating an extraordinary expense request, neither she nor her staff had inquired into the specific facts of any case or obtained confidential information.

Regarding some of the other specific charges detailed in the declarations Shadonna submitted, Krinsky explained that she added her name to the intraoffice e-mail list of all CLC units in June 2003 "in order to be kept apprised of general office email discussions of events, issues of common concern, or other non-case specific matters." She also stated that when concern was raised "that these email groups might on occasion also include emails relating to case-specific and confidential information, [she] immediately directed that a client confidential email group be created for each unit, without [her] inclusion in those groups, and informed [CLC's] staff that all client confidential and case specific email communication should occur on that email group." Krinsky also stated that she had "no recollection" of a meeting in early 2003 during which, according to Sherman's declaration, she asked fact-specific questions of one of Sherman's lawyers, and that she had "no specific recollection" of the conversation that, according to di Donato, occurred in di Donato's office. She did recall what she described as "a late-night 'rapport-building' conversation" with di Donato. She acknowledged having had conversations with di Donato concerning which cases di Donato could take with her when she left CLC, but denied that any "client confidential information was ever passed to" her during those conversations. Krinsky also acknowledged that CLC had once adopted a policy regarding "the exercise of *blanket* peremptory challenges that were not tethered to a particular case," but stated that the policy (1) "made clear that it in no way constrained the exercise of decisionmaking in individual cases and that those decisions remained the prerogative of individual attorneys, under the supervision of their unit heads," and (2) "clearly precluded the sharing of any confidential or case specific information with the Executive Director or among unit heads." She also declared that the policy had been put "in abeyance."

Regarding employment practices, Krinsky stated that "[a]s was the case under" the operating procedures *Castro* reviewed, under CLC's Revised Operating Procedures, she, as CLC's executive director, had (1) "final authority, upon the recommendation of the CLC Unit Heads, with regard to promoting, terminating, or disciplining CLC['s] lawyers or staff members," (2) "authority over CLC['s] budget and how funds get allocated in relation to CLC['s] operating costs," and (3) "authority over hiring decisions, and assignment of lawyers to particular CLC units." Krinsky also acknowledged that secretaries were moved between units, but stated that this practice

predated her employment as executive director and that she directed that secretaries be advised of the need to preserve client confidences.

CLC also submitted declarations from its unit heads, David Estep, Marc Leftwich, and Ivy Carey. Estep, who headed Unit 1, which formerly represented Shadonna, denied that he, the executive officers, or any Unit 1 attorney had access to files of cases assigned to Units 2 and 3. He also stated that Krinsky had underscored the need to ensure that secretaries were advised of and abided by the rules for preserving client confidences and maintaining ethical walls, and that CLC strictly enforced ethical walls separating Units 1, 2, and 3, and the executive leadership. Finally, he stated that one of his "role[s]" as unit head was to "ensure that no attorneys or staff from" Units 2 and 3 "have access to the case files and client confidential information relating to cases assigned to" Unit 1, and that he neither was "aware" of nor "believe[d]" there had been any "material breaches of CLC Operating Procedures, CLC's ethical walls, or the CLC conflicts policy." Leftwich, who headed Unit 2, and Carey, who headed Unit 3, made similar statements. Leftwich also stated that he had complete autonomy in funding ordinary trial expenses consistent with the limitations of the Unit 2 budget. As to Korenstein's statement that he was once directed to forward a request for expert witness funding to the head of Unit 1, Leftwich noted Korenstein's failure to identify the case or client involved and stated his (Leftwich's) recollection that "the request was for an extraordinary expense and that the decision not to hire this particular expert witness was made independent of cost and based on strategic reasons related to the specifics of the case and discussed *only* with and among [Unit 2] attorneys and supervisors." Carey stated that she opposed the disqualification motion as head of Unit 3, no one had pressured her to do so, and she had "full autonomy with regard to representing" Charlisse.

The juvenile court granted the disqualification motion. In the court's view, the key issue was whether CLC's current structure "either inherently or in practice violates the ethical walls that *Castro* mandated to be in place in order to allow an umbrella organization to represent more than one party in a pending lawsuit." Finding the declarations supporting the disqualification motion to be "more persuasive than the opposition motion," the court explained: "I get the impression that CLC says one thing and does something else. [¶] They have established a structure which they claim they strictly adhere to, but the underlying facts suggest otherwise." The court noted that it was basing its decision on "the whole picture, . . . taking all of the declarations together," but that two things in particular "jumped out" of the record: (1) Sherman's "allegations or assertions" that Krinsky "went into their computer system without getting permission or consent in order to get access to confidential communications that were being circulated in each office"; and

(2) a "subtle change" since *Castro* in CLC's rules regarding certain employment decisions. Regarding the latter, the court reasoned that whereas the operating rules at issue in *Castro* permitted promotion, discipline, and termination to be initiated *only* by the chief attorney of each CLC unit, the Revised Operating Procedures, although possibly "ambiguous," "seem[ed] to imply that the executive director could initiate" these actions and had "assumed the responsibility or the authority to fire or promote, etcetera." Finally, although acknowledging CLC's point that there had "been no evidence presented of any specific breach of confidentiality in any particular case," the court stated: "The courts seem to be really concerned about, in addition, the appearance of conflict. And it seems to me that in the consolidation of all of the cases into one core unit and the practice that's been presented in the declarations, . . . the ethical walls may have been breached." Summarizing, the court explained that it was disqualifying CLC based on "a violation . . . of the *Castro* and *Christian* safeguards regarding conflict of interest in representing multiple parties in the same action."[6]

During subsequent hearings related to a requested stay of its disqualification order, the court reiterated the basis of its ruling. It explained that "no specific—to this case—conflict [had been] raised in terms of the divulgence of any confidential or privileged communication" and "no evidence [had been] presented of an actual factual conflict," and that it based the disqualification order on its finding of "a *Castro* type [structural] conflict" created by "a gradual erosion of [CLC's] ethical walls" that precluded CLC from "represent[ing] more than one party to a lawsuit."

A divided Court of Appeal, producing three separate opinions, reversed the disqualification order. In the lead opinion, Justice Mosk asserted that the *Castro* factors are not dispositive here because *Castro* involved concurrent representation—i.e., CLC's simultaneous representation of multiple parties in a single proceeding—whereas this case involves successive representation—i.e., CLC's representation of a party whose interests are adverse to a *former* CLC client. Instead, Justice Mosk reasoned, on the facts here, whether disqualification is warranted turns on the likelihood "that confidential information relating to [Shadonna's] prior representation by [CLC's] Unit 1 would be shared with or be readily accessible to [Charlisse's] current attorney in . . . Unit 3." In Justice Mosk's view, because Shadonna's evidence failed to establish such a likelihood, disqualification was unwarranted. Moreover, Justice Mosk explained, the record did not warrant disqualification even under *Castro*. In a concurring opinion, Justice Armstrong "agree[d] with" Justice Mosk's "analysis of the facts with reference to *Castro*" and with his

---

[6] After stating and explaining its tentative ruling, the court offered to hold an evidentiary hearing to give CLC an opportunity "to [flesh] out further the declarations and cross-examine the declarants." CLC declined the offer.

conclusion that the evidence "cannot be read to support a finding that CLC meaningfully departed from the practices approved in *Castro* and operated as one law firm." Thus, in Justice Armstrong's view, because "CLC operated as three separate law firms," disqualification was improper. In dissent, Presiding Justice Turner argued that the juvenile court "reasonably could have found" from the evidence that "while [CLC] represented" Shadonna, "the ethical restrictions imposed on a nonprofit legal services corporation recognized in *Castro* . . . were materially violated and, under established successive representation rules, disqualification was warranted."

We then granted the petitions for review of Shadonna and Charlisse.

## DISCUSSION

"A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.' [Citations.]" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145 [86 Cal.Rptr.2d 816, 980 P.2d 371] (*SpeeDee Oil*).) "Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.]" (*Id.* at p. 1143.) As to disputed factual issues, a reviewing court's role is simply to determine whether substantial evidence supports the trial court's findings of fact; "the reviewing court should not substitute its judgment for . . . express or implied [factual] findings [that are] supported by substantial evidence. [Citations.]" (*Ibid.*) As to the trial court's conclusions of law, however, review is de novo; a disposition that rests on an error of law constitutes an abuse of discretion. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712 [76 Cal.Rptr.3d 250, 182 P.3d 579]; *People v. Superior Court* (*Humberto S.*) (2008) 43 Cal.4th 737, 742 [76 Cal.Rptr.3d 276, 182 P.3d 600].) The trial court's "application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi, supra*, at p. 712.)

Conflicts of interest commonly arise in one of two factual contexts: (1) in cases of successive representation, where an attorney seeks to represent a client with interests that are potentially adverse to a former client of the attorney; and (2) in cases of simultaneous representation, where an attorney seeks to represent in a single action multiple parties with potentially adverse interests. The primary fiduciary value at stake in each of these context differs, and the applicable disqualification standards vary accordingly. In successive representation cases, "the chief fiduciary value jeopardized is that of client confidentiality." (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283 [36 Cal.Rptr.2d 537, 885 P.2d 950] (*Flatt*).) Therefore, the disqualification standards we have developed for such cases focus on the former client's interest

"in ensuring the permanent confidentiality of matters disclosed to the attorney in the course of the prior representation." (*Ibid.*) In simultaneous representation cases, "[t]he primary value at stake . . . is the attorney's duty—and the client's legitimate expectation—of *loyalty*, rather than confidentiality." (*Id.* at p. 284.) ■ Because a conflict involving an attorney's duty of loyalty is "[t]he most egregious" kind of conflict, the disqualification standards we have developed for simultaneous representation cases are "more stringent" than those that apply in successive representation cases; "[w]ith few exceptions, disqualification [in a case of simultaneous representation] follows automatically, regardless of whether the simultaneous representations have anything in common or present any risk that confidences obtained in one matter would be used in the other. [Citation.]" (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1147.) This strict rule recognizes that "[a] client who learns that his or her lawyer is also representing a litigation adversary, even with respect to a matter *wholly unrelated* to the one for which counsel was retained, cannot long be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship. All legal technicalities aside, few if any clients would be willing to suffer the prospect of their attorney continuing to represent them under such circumstances." (*Flatt, supra,* 9 Cal.4th at p. 285, italics omitted.)

■ In light of these principles, we conclude the juvenile court here applied an incorrect legal standard in disqualifying CLC. As explained above, the juvenile court stated it was ordering disqualification based on CLC's failure to observe the structural safeguards discussed in *Castro* and *Christian.* However, unlike the case now before us, which involves *successive* representation—i.e., CLC's proposed representation of a client, Charlisse, whose interests arguably are adverse to a *former* CLC client, Shadonna—*Castro* and *Christian* involved "conflicts arising from *simultaneous* representation."[7] (*Cobra, supra,* 38 Cal.4th at p. 849, italics added.) Because *Castro* and *Christian* involved simultaneous representation, the disqualification standards they applied necessarily were different from—and more stringent than—the standards that govern the *successive* representation case now before us. Accordingly, as the Court of Appeal's lead opinion here observed, the factors emphasized in *Castro* and *Christian* are not necessarily dispositive in this case, and the juvenile court's finding that CLC did not observe some of the

---

[7] *Castro* addressed a challenge to CLC's ability simultaneously to represent in a single action multiple parties with potentially adverse interests. (*Castro, supra,* 232 Cal.App.3d at p. 1434.) In *Christian,* on appeal from his criminal conviction, the defendant argued that a conflict of interest existed between his codefendant's trial attorney, who was a deputy public defender, and his own trial attorney, who was a member of the alternate defender's office (ADO), because the ADO was "a branch of" the county public defender's office and was under the public defender's supervision. (*Christian, supra,* 41 Cal.App.4th at pp. 989–992.)

safeguards *Castro* and *Christian* discussed does not automatically warrant disqualification. The juvenile court committed legal error—and thus, abused its discretion—in concluding otherwise.[8]

■ Where, as in this case, the potential conflict arises from an attorney's *successive* representation of clients with potentially adverse interests, and the primary value at stake is therefore client confidentiality, the correct legal standard generally requires disqualification of the attorney if "the [former] client demonstrate[s] a '*substantial relationship*' between the subjects of the antecedent and current representations." (*Flatt, supra,* 9 Cal.4th at p. 283.) Through the rule of "vicarious disqualification," we have generally extended this rule to require disqualification of a disqualified attorney's entire law firm. (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1153.) Thus, "[w]hen a conflict of interest requires an attorney's disqualification from a matter, the disqualification normally extends vicariously to the attorney's entire law firm. [Citation.]" (*Id.* at p. 1139.) "The rule of vicarious disqualification is based upon the doctrine of imputed knowledge," which posits that the knowledge of one attorney in a law firm is the knowledge of all attorneys in the firm. (*Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1333 [104 Cal.Rptr.2d 116].) By "recogniz[ing] the everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information" (*SpeeDee Oil, supra,* 20 Cal.4th at pp. 1153–1154), the vicarious disqualification rule "safeguards clients' legitimate expectations that their attorneys will protect client confidences. [Citation.]" (*Id.* at p. 1139.)

CLC does not dispute that a substantial relationship exists between the subjects of the former and current representations at issue here. Accordingly, for purposes of analyzing this case, we assume that the Unit 1 attorney who formerly represented Shadonna has a disqualifying conflict of interest. Thus, the only question here is whether, under the vicarious disqualification rule, that disqualifying conflict of interest requires disqualification of all other CLC attorneys, including the Unit 3 attorney the juvenile court appointed to represent Charlisse.

■ In answering this question, we begin by noting that there are court-created limitations to the vicarious disqualification rule, which itself was

---

[8] In reaching this conclusion, we express no opinion as to whether a failure to observe one or more of the structural safeguards *Castro* discussed would require CLC's disqualification in a simultaneous representation case. We note, however, that although *Castro* discussed the existence of certain structural safeguards as one of many factors in its analysis, it did not purport to establish a bright-line test of disqualification based on those safeguards or suggest that disqualification would be necessary absent one of those safeguards. On the contrary, it "emphasized that rulings on disqualifications must proceed according to the circumstances of each case, in light of several competing interests." (*Castro, supra,* 232 Cal.App.3d at p. 1441.)

"judicially created." (*Cobra, supra,* 38 Cal.4th at p. 848.) As here relevant, California courts have generally declined to apply an automatic and inflexible rule of vicarious disqualification in the context of public law offices. Instead, in this context, courts have looked to whether the public law office has adequately protected, and will continue to adequately protect, the former client's confidences through timely, appropriate, and effective screening measures and/or structural safeguards.

For example, in *City of Santa Barbara v. Superior Court* (2004) 122 Cal.App.4th 17, 27 [18 Cal.Rptr.3d 403] (*Santa Barbara*), where an attorney representing homeowners in litigation against the City of Santa Barbara left her private law firm and joined the city attorney's office, the court held that the attorney's disqualifying conflict of interest did not warrant recusal of the entire city attorney's office in light of "screening measures established by the city attorney" that were "both timely and effective in protecting the [home-owners'] confidences." In *Chadwick v. Superior Court* (1980) 106 Cal.App.3d 108, 119 [164 Cal.Rptr. 864], where an attorney left a county public defender's office and joined the local district attorney's office, the court held that because screening measures had "sufficiently isolated" the attorney "from the prosecution of his former clients," his disqualifying conflict of interest did not warrant disqualifying the entire district attorney's office from prosecuting cases in which he had represented the defendants. And in *Love v. Superior Court* (1980) 111 Cal.App.3d 367, 374 [168 Cal.Rptr. 577], where a public defender's legal research assistant became an attorney and joined the major crimes section of the local district attorney's office, the court held that only the attorney and the other lawyers in his section were disqualified from prosecuting a defendant for whom the attorney had worked while at the public defender's office; the other attorneys in the district attorney's office, who had no "working relationship" with the attorney in question, were not. (See also *In re Charles L.* (1976) 63 Cal.App.3d 760, 765 [132 Cal.Rptr. 840] [declining to impute confidential knowledge of one attorney in county district attorney's office to entire staff, given "the size and structure of the organization" and "no evidence that information concerning [defendants] flows freely within the district attorney's office"]; *People v. Pineda* (1973) 30 Cal.App.3d 860, 865 [106 Cal.Rptr. 743] ["absen[t] . . . some affirmative showing that a particular deputy public defender has acquired confidential adverse information about a defendant from the files or other employees of the office, any claim of conflict of interest would be groundless"]; cf. *Chambers v. Superior Court* (1981) 121 Cal.App.3d 893, 903 [175 Cal.Rptr. 575] [reversing disqualification order in part because private law firm representing plaintiffs had "undertaken sufficient protective measures to screen" former government attorney "from any participation" in action against the state].)

Courts have cited several considerations in declining to apply an automatic and inflexible rule of vicarious disqualification in the context of public

law offices. Summarizing some of these considerations, the court in *Santa Barbara* explained: "Unlike their private sector counterparts, public sector lawyers do not have a financial interest in the matters on which they work. As a result, they may have less, if any, incentive to breach client confidences. [Citation.] Public sector lawyers also do not recruit clients or accept fees. As a result, they have no financial incentive to favor one client over another. [Citation.] [¶] . . . [V]icarious disqualification in the public sector context imposes different burdens on the affected public entities, lawyers and clients. Most frequently cited is the difficulty public law offices would have in recruiting competent lawyers. Private sector law firms may hesitate to hire a lawyer from a public law office, to avoid being disqualified in future matters involving that office. Individual lawyers may hesitate to accept public sector jobs, to avoid limiting their future opportunities in the private sector. [Citation.] Clients whose interests are adverse to a public entity could be deprived of their chosen counsel, or find it difficult to retain counsel at all, particularly in highly specialized areas of the law. [Citation.] Public entities may face the same difficulty and be forced to avoid hiring lawyers with relevant private sector experience. Disqualification increases costs for public entities just as it does for private sector litigants. When a public entity is involved, these higher costs raise the possibility that litigation decisions will be driven by financial considerations rather than by the public interest. [Citation.]" (*Santa Barbara, supra,* 122 Cal.App.4th at pp. 24–25.) Moreover, public law offices often have "a special area of expertise not generally shared by the litigation bar." (*Id.* at p. 23, fn. 1.) "In light of these considerations, courts have more readily accepted the use of screening procedures or ethical walls as an alternative to vicarious disqualification in cases involving public law offices." (*Id.* at p. 25.) As the *Christian* court put it, "in the public sector, in light of the somewhat lessened potential for conflicts of interest and the high public price paid for disqualifying whole offices of government-funded attorneys, use of internal screening procedures or 'ethical walls' to avoid conflicts within government offices . . . have been permitted. [Citations.]" (*Christian, supra,* 41 Cal.App.4th at p. 998.)

■ Courts have also held, however, that where the attorney with the actual conflict has managerial, supervisorial, and/or policymaking responsibilities in a public law office, screening may not be sufficient to avoid vicarious disqualification of the entire office. For example, in *Younger v. Superior Court* (1978) 77 Cal.App.3d 892, 894–897 [144 Cal.Rptr. 34], where an attorney representing a criminal defendant became the assistant district attorney in a county district attorney's office, the Court of Appeal found that the trial court did not abuse its discretion in disqualifying the entire district attorney's office. The appellate court reasoned that, despite "steps . . . taken to insure that [the assistant district attorney] ha[d] no contacts with the prosecution of any of his [former] clients," two aspects of

his job duties created "an *appearance* of possible impropriety" that rendered the trial court's decision "reasonable": (1) his attendance at weekly meetings of the office's executive staff, which meant he could, even "quite innocently," participate in formulating prosecutorial policies that might affect the office's prosecution of his former clients; and (2) his membership on the office's promotions committee, which might impact how attorneys in the office handled cases against his former clients. (*Id.* at pp. 896–897.)[9] Similarly, in *People v. Lepe* (1985) 164 Cal.App.3d 685, 689 [211 Cal.Rptr. 432], where an attorney representing criminal defendants became *the* District Attorney for Imperial County, the Court of Appeal found that the trial court had not abused its discretion in disqualifying the entire district attorney's office, reasoning: "As the deputies are hired by [the district attorney], evaluated by [him], promoted by [him] and fired by [him], we cannot say the office can be sanitized such to assume the deputy who prosecutes the case will not be influenced by the considerations that bar [the district attorney] himself from participation in the case."

■ In *Cobra*, we recently reviewed and applied these principles in affirming an order disqualifying the entire San Francisco City Attorney's Office from representing the City and County of San Francisco (City) in the City's civil lawsuit against a company the city attorney, before his election, had represented in connection with substantially related matters. (*Cobra, supra*, 38 Cal.4th at p. 843.) We noted that the city attorney had taken "measures to screen himself from the case to the extent that it could involve [his] former client." (*Id.* at p. 844.) Citing *Santa Barbara* and *Chadwick*, we also noted that "California courts have upheld the ethical screening of" a disqualified attorney "within the government office to protect confidences the attorney obtained from the former client in a prior representation" that preceded the attorney's employment with the "government law office." (*Cobra, supra*, at p. 853.) However, we found those decisions inapposite because, in each case, "the attorney who was subject to ethical screening was simply one of the attorneys in the government office, not . . . the City Attorney under whom and at whose pleasure all deputy city attorneys serve." (*Ibid.*) In explaining why, on the facts presented, ethical screening was insufficient to prevent disqualification of the entire public law office, we stated: "Individuals who head a government law office occupy a unique position because they are ultimately responsible for making policy decisions that determine how the agency's resources and efforts will be used. Moreover, the attorneys who serve directly under them cannot be entirely insulated from those policy decisions, nor can they be freed from real or perceived concerns as to what their boss wants. The power to review, hire, and fire is a

---

[9] In *Cobra, supra*, 38 Cal.4th at page 850, we observed that although the Legislature, by statute, had "superseded" *Younger's* holding, "the concerns" the *Younger* court "expressed about conflicted heads of public law offices . . . have not lost their relevance." (Fn. omitted.)

potent one. Thus, a former client may legitimately question whether a government law office, now headed by the client's former counsel, has the unfair advantage of knowing the former client's confidential information when it litigates against the client in a matter substantially related to the attorney's prior representation of that client." (*Id.* at pp. 853–854.) Finally, "[p]ublic perception that a city attorney and his deputies might be influenced by the city attorney's previous representation of the client, at the expense of the best interests of the city, would insidiously undermine public confidence in the integrity of municipal government and its city attorney's office." (*Id.* at p. 854.)

Although we affirmed the trial court's broad disqualification order in *Cobra* on the facts there presented, we noted that "ethical screening might suffice to shield a senior supervisory attorney with a personal conflict and thus avoid vicarious disqualification of the entire government legal unit under that attorney's supervision." (*Cobra, supra,* 38 Cal.4th at p. 850, fn. 2.) We explained that, in ruling on a disqualification motion involving this situation, a trial court should make "a factual inquiry" into the supervisor's (1) "actual duties . . . with respect to those attorneys who will be ethically screened," and (2) "responsibility for setting policies that might bear on the subordinate attorneys' handling of the litigation. In addition, the trial court should consider whether public awareness of the case, or the conflicted attorney's role in the litigation, or another circumstance is likely to cast doubt on the integrity of the governmental law office's continued participation in the matter." (*Ibid.*)

The approach the decisions discussed above have taken with respect to public law offices is the approach the juvenile court should have taken here in deciding whether to disqualify CLC.[10] In other words, the juvenile court should have determined whether CLC has adequately protected, and will continue to adequately protect, Shadonna's confidences through timely, appropriate, and effective screening measures and/or structural safeguards. This approach is appropriate with respect to CLC because, as the court in *Castro* explained in declining to apply to CLC the strict vicarious disqualification rule that applies to private law firms in simultaneous representation cases: "Unlike a private law firm, [CLC] is a nonprofit corporation. It is a creation of a public entity, the Board." (*Castro, supra,* 232 Cal.App.3d at p. 1442.) It "represents clients who cannot and do not pay for services rendered on their behalf. A third party, the [B]oard, funds [CLC], and clients do not pay for the services the law firm renders. Hence no client becomes 'more important' than some other client, and no [CLC] lawyer has any 'obvious financial incentive'

---

[10] These decisions belie the assertion of Shadonna and counsel for Charlisse that an inquiry into the existence and adequacy of screening in a public law office is inconsistent with relevant California precedent.

to favor one client over another. Quite the opposite is true; because a third party pays, the attorney has every incentive to devote his or her entire efforts on behalf of the client." (*Id.* at p. 1441.) Thus, as the lead opinion here explained, whether CLC's disqualification is warranted turns on the likelihood that the Unit 3 attorney the juvenile court appointed to represent Charlisse has obtained or will acquire, either intentionally or inadvertently, confidential information CLC acquired through Unit 1's prior representation of Shadonna.

However, we do not agree with the lead opinion that the evidentiary burden on this issue falls on Shadonna as the party seeking disqualification. Instead, the burden is on CLC to show that, through timely, appropriate, and effective screening measures and/or structural safeguards, the confidential information acquired during Unit 1's prior representation of Shadonna has been, and will be, adequately protected during Unit 3's proposed representation of Charlisse.[11] This burden properly falls on CLC because it has unique access to the relevant information.[12] (Cf. *In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 596 [283 Cal.Rptr. 732] [attorney resisting disqualification "has the burden of showing" effective screening of employee with confidential information from former employment]; *Higdon v. Superior Court* (1991) 227 Cal.App.3d 1667, 1680 [278 Cal.Rptr. 588] [party resisting disqualification has "the burden to show that effective screening" of disqualified attorney "has taken place"]; see also *U.S. v. Goot* (7th Cir. 1990) 894 F.2d 231, 235, fn. 8 [law office resisting disqualification must establish that " 'infected' attorney" has been sufficiently screened]; *Schiessle v. Stephens* (7th Cir. 1983) 717 F.2d 417, 421 [same]; *State v. Pennington* (Ct.App. 1993) 115 N.M. 372 [851 P.2d 494, 501] ["state has the burden to establish that staff members working on the prosecution have been effectively screened from contact with the disqualified staff member"]; *State v. Tate* (Tenn.Crim.App. 1995) 925 S.W.2d 548, 557 ["burden of proof must rest upon the state to establish that appropriate screening measures have been taken"].)

It is unclear from the record here whether, under the proper standards, the juvenile court would have disqualified CLC. On the one hand, it is significant

---

[11] We speak here only of the burden as to protection of the former client's information. It remains the former client's burden to show both the fact of the former representation and the existence of a substantial relationship between the former and current representations. (*Flatt, supra,* 9 Cal.4th at p. 283.) We disapprove *People v. Pineda, supra,* 30 Cal.App.3d 860, to the extent it suggests the burden is on the party seeking disqualification to show that actual information sharing has occurred.

[12] In addition, this allocation of burden will minimize the discovery issues that, according to Shadonna and counsel for Charlisse, the Court of Appeal's lead opinion would create by placing the burden on the party seeking disqualification. In any event, the discovery issues involved in applying this approach seem no greater than those involved in the juvenile court's approach, i.e., determining the extent of CLC's adherence to the structural safeguards *Castro* discussed.

that the juvenile court found no evidence "of any specific breach of confidentiality in any particular case," "no evidence . . . of an actual factual conflict," and "no specific—to this case—conflict raised in terms of the divulgence of any confidential or privileged communication." On the other hand, potentially significant evidentiary omissions exist in the record that make it inadvisable to make a disqualification determination in the first instance on appeal. For example, the record contains no evidence as to whether Shadonna's former Unit 1 attorney is still with that unit, has transferred to another unit, or has left CLC altogether.[13] Nor is there any evidence as to whether the Unit 3 attorney who proposes to represent Charlisse now either was with CLC when Unit 1 represented Shadonna or was with Unit 1 at some point. Notably, neither attorney submitted a declaration with factual information relevant to Shadonna's disqualification motion.[14] Because the parties and the juvenile court focused on the wrong legal standards, and because the rules we discuss here are new in some respects (e.g., regarding placement of the evidentiary burden), "[w]e cannot foreclose the possibility that further information was available, but not presented, at the time the [juvenile] court ruled upon the motion." (*People v. Calderon* (1994) 9 Cal.4th 69, 81 [36 Cal.Rptr.2d 333, 885 P.2d 83].) Accordingly, the prudent course is to remand the matter to the juvenile court for rehearing of the disqualification motion, rather than to decide the matter on the existing state of the evidentiary record. (*Ibid.*; see also *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 824 [111 Cal.Rptr.2d 87, 29 P.3d 175] ["proper course" is to remand for application of "new" standard "to the facts of this case"]; *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 803 [85 Cal.Rptr.2d 844, 978 P.2d 2] [remand for further factfinding appropriate where trial court's application of incorrect legal standard keeps it from resolving factual disputes]; *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442, 454 [153 Cal.Rptr. 28, 591 P.2d 51] [remand proper where trial court's ruling "rested upon [an] erroneous legal basis" and thus "constituted an abuse of . . . discretion"].) On remand, the parties may present additional evidence on the issues involved.[15]

---

[13] As previously noted, CLC's original operating procedures provided that "[a]ttorneys may not be transferred between offices." The Revised Operating Procedures now in effect contain no similar prohibition, and instead provide that "CLC's executive leadership shall be responsible for . . . assigning" staff attorneys "to the core firm or conflict unit(s)."

[14] As we have noted in a related context, "[s]worn representations have been held to be effective in assuring the court that insulation of prior confidential communications from present representation has occurred and will continue to occur. [Citations.]" (*People v. Clark* (1993) 5 Cal.4th 950, 1002 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

[15] In noting information that is absent from this record, we are not holding that the missing information is either necessary or determinative in every case. Nor are we holding that the evidence here regarding CLC's structure, its structural safeguards, and its general compliance or noncompliance with those safeguards, is not relevant or significant. We are simply identifying information that may be important in determining whether the former client's

## Disposition

Because, as explained above, the juvenile court applied the wrong legal standards and reconsideration of the disqualification motion is therefore appropriate, the Court of Appeal's judgment reversing the disqualification order is affirmed with directions to remand this action to the juvenile court for a hearing on Shadonna's disqualification motion in accordance with the views expressed in this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

---

confidential information has been, and will continue to be, adequately protected. As case law suggests, other information—such as the former attorney's supervisorial duties—may also be important.