Filed 11/1/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re D.M. et al., Persons Coming Under the Juvenile Court Law. | B312479 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. Nos. DK05123C-E) |
| Plaintiff and Respondent, | |
| v. | |
| RICARDO M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Stephen C. Marpet, Juvenile Court Referee. Reversed and remanded.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Father Ricardo M. appeals the termination of parental rights to now 13-year-old D.M., 10-year-old R.M. and six-year-old I.M. He contends the juvenile court abused its discretion because it applied the wrong legal standard in finding the beneficial relationship exception to termination of parental rights did not apply. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).) Father argues the juvenile court did not have the benefit of new authority, *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), at the time it made its decision, and based its ruling on improper factors under *Caden C.* We agree and reverse and remand for the juvenile court to conduct a new section 366.26 hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

This family came to the attention of the Los Angeles County Department of Children and Family Services (Department) in February 2017, following a domestic violence incident between mother and father. Mother called the child abuse hotline to report that father had pushed her. Father admitted to mother he was using methamphetamines. Mother did not work, and father was the sole financial provider for the family. They were not married but had been in a relationship for over 14 years.

When father was interviewed by the Department, he denied any domestic violence or drug use, and he did not appear to be under the influence of drugs. The children denied witnessing any domestic violence, but admitted that mother and father argued.

The family has a history with the Department, with referrals for physical abuse by mother in 2010, emotional abuse and neglect by mother and father in 2012, and a prior dependency case in 2014 based on domestic violence and mother's substance abuse. The family reunified in 2015, and jurisdiction was terminated in 2016.

In this case, the children were initially detained from father and allowed to remain with mother with family maintenance

2

services. Father was required to move out of the family home. The court issued a temporary restraining order and ordered father's visitation to be monitored.

When D.M. was interviewed in April 2017, she reported that she does not fear father and "would like to see him." Father asked the social worker to help facilitate his visitation with the children. During his April 2017 interview, he was cogent, engaged, and did not appear to be under the influence of any substances. Father denied any domestic violence and reported he had learned a lot from his past programs. He wanted to reconcile with mother and return to the family residence.

Father visited with the children on April 23, 2017, and the visit went well. The children were happy to see father. They hugged him, and father was appropriate and affectionate. He also provided them with new clothes and shoes.

Father consistently tested negative for drugs in March, April, and May. He also enrolled in domestic violence counseling in April 2017.

At the May 2017 jurisdictional hearing, the court sustained domestic violence allegations and removed the children from father. Father was ordered to drug test, participate in parenting classes, individual counseling, and a domestic violence program. His visitation was to be unmonitored as long as he tested negative for drugs.

Through July 2017, father continued to test negative, and mother and the children reported that his unmonitored visits were going well. He visited with the children on Sundays from 9:00 a.m. until 1:00 p.m.

On November 9, 2017, the Department filed a subsequent petition under Welfare and Institutions Code section 342, alleging that mother left the youngest child, then two-year-old I.M.,

3

unattended. He was found wandering in a parking lot, wearing only a diaper, while mother was sleeping in the family's apartment. Mother was arrested for felony child endangerment. The children were detained and placed with maternal aunt.

Father was not communicating with the Department and had not provided his address, so at the November 14, 2017 review hearing, the court required that his visits revert to twice weekly, monitored.

The Department's January 31, 2018 report stated father had not made himself available to visit with the children since November. He canceled scheduled visits or did not show up. However, he continued to test negative for drugs.

On March 16, 2018, the Department filed a first amended Welfare and Institutions Code section 342 petition, which added allegations that father was residing in the family home in violation of the court's orders. The court sustained the section 342 petition, removed the children from mother, ordered the parents to participate in reunification services, and ordered that visitation was to be monitored. The court granted mother a temporary restraining order against father, which the court made permanent on May 30, 2018.

According to the September 2018 status review report, mother and father "have yet to demonstrate ability to engage and learn the day to day medical, educational, behavioral, and emotional needs of the children" and their visitation had been "inconsistent." Father continued to consistently test negative for drugs. He completed parenting and domestic violence programs. But he did not respond to numerous messages from the social worker and would not provide a home address for the Department to assess.

According to the Department, father was unable to "structure his visits so as to ensure a healthy dynamic that promotes bond." He had difficulty "control[ling] the children" and the children would not listen to him. He would bring food and gifts and offered rewards to try to set boundaries with the children, but had a hard time engaging all of them to ensure that no one was left out. R.M. and I.M. were out of control during visits, but D.M. tried to help father with her younger brothers. Both R.M. and I.M. had tantrums during visits. Father could not redirect them and did not know how to control the children when they had tantrums. However, R.M. and I.M. also displayed these same troubling behaviors with their caregiver, and their behavior was not specific to father.

The Department's January 2019 report confirmed that father continued to test negative. Father's visits were inconsistent because he did not always call to confirm the visits in advance, so they were canceled. However, the children were affectionate with father during visits. Father still struggled with structuring the visits and redirecting the younger children during tantrums.

A March 2019 last minute information reported that father visited the children only once each month in January, February, and March, even though more visits were available. Father would play with the children or watch movies during his visits. The social worker reported that father has "not demonstrated diligence and genuine effort to learn about the day to day medical, emotional, developmental, and behavioral needs of [his] children."

The children had been diagnosed with disorders related to prenatal alcohol exposure, which caused delays, learning difficulties, and behavioral and emotional problems. According to the Department, "the children have a wide range of needs and

5

parents have not engaged genuinely to remain informed" about the children's needs.

At the May 14, 2019 review hearing, the court terminated the parents' reunification services.

The Department's September 2019 Welfare and Institutions Code section 366.26 report noted that father was visiting the children more consistently. He was visiting weekly on Fridays. Father brought gifts for the children, but still had difficulty managing all of the children. The Department opined the children were adoptable, and that maternal aunt was committed to providing them with permanency, although the Department had concerns about her ability to care for the children, because she lacked parenting skills and was not obtaining necessary services for the children.

The Department's March 2020 status review report did not contain an update about father's visitation and stated further information about his visitation would be provided by last minute information. However, no last minute information addressing father's visitation was filed by the Department.

The permanency planning hearing was continued due to the COVID-19 emergency. Father's visits were temporarily interrupted by the pandemic, but father visited with the children by video conferencing. According to the October 2020 review report, "[f]ather has not demonstrated genuine effort to resume in person visits" even though the Department tried to schedule in-person visits in June 2020. Nevertheless, the visitation monitor did not report any concerns about the quality of father's visits. A March 9, 2021 in-person visit with D.M. went well; D.M. "was responsive to her father."

A contested Welfare and Institutions Code section 366.26 hearing was held on April 28, 2021. Father testified that he visited

the children twice a week, and that he usually plays with them, asks how they are doing in school, and how they feel. He does not attend doctor's appointments because he was not told about their appointments. According to father, the children do not want to leave at the end of visits, I.M. would cry when visits ended, and all of the children told father they want to live with him.

Father's counsel argued that the parental bond exception to the termination of parental rights applied. The court terminated father's parental rights, finding "that there is no (c)(1)(B)(1) exception. Father's been having monitored visits fairly consistently but not terribly consistent. Doesn't set up a schedule. Doesn't know his children's medical needs. Hasn't attended any dental or medical appointments. He never asked anyone to attend. Has not risen to the level of a parent."

Father timely appealed.

## DISCUSSION

Father argues that we must reverse the order terminating his parental rights and remand for the juvenile court to consider application of the beneficial relationship exception to the termination of parental rights under *Caden C.*, because the juvenile court focused on improper factors when making its ruling.

The purpose of a Welfare and Institutions Code section 366.26 hearing is to select a permanent plan for the child after reunification services have terminated. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 304; see also § 366.26, subd. (b)(1).) " 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' " (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.)

7

"[A] parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception. What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*Caden C., supra,* 11 Cal.5th at p. 629; see also Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)

The first requirement, regular visitation and contact, is "straightforward" and "[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' " (*Caden C., supra,* 11 Cal.5th at p. 632.) "[T]he relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid*.) Focusing on the child, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Ibid*.) Recognizing that "rarely do '[p]arent-child relationships' conform to an entirely consistent pattern," the Supreme Court stated "it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' " (*Ibid*.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C., supra*, 11 Cal.5th at p. 633.) "[C]ourts need to determine . . . how the child would be

affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid*.)  Thus, " '[i]f severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Ibid*.)

The third element of the exception is the most difficult question for the juvenile court to resolve.  A parent-child relationship sometimes "involves tangled benefits and burdens" and "[i]n those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C*., *supra*, 11 Cal.5th at p. 634.)

The Supreme Court in *Caden C*. also discussed *improper* considerations in deciding whether termination of parental rights would be detrimental to a child.  It is improper to compare a "parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)" when weighing whether termination would be detrimental to the child. (*Caden C*., *supra*, 11 Cal.5th at p. 634.)  The hearing "is decidedly not a contest of who would be the better custodial caregiver." (*Ibid*.)

A parent's "continued struggles" with the issues that led to dependency cannot, standing alone, be a bar to the parental-benefit exception. (*Caden C*., *supra*, 11 Cal.5th at p. 637.)  "The exception preserves the child's right to the relationship even when the child cannot safely live with that parent.  What it does not allow is a judgment about the parent's problems to deprive a child of the chance to continue a substantial, positive relationship with the parent." (*Id*. at p. 643.)  However, a parent's struggles with the issues that led to the dependency are "relevant to the application of the [parental-benefit] exception" because it may be probative of

9

whether interaction between parent and child has a negative effect on the child. (*Id.* at p. 637.)

We apply the substantial evidence standard in reviewing the court's findings on the first two elements, whether the parent has consistently visited and maintained contact with the child, and whether the relationship is such that the child would benefit from continuing it. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) We review the court's findings as to the third element, whether there is detriment to the child in severing the relationship, for abuse of discretion. (*Id.* at p. 640; *id.* at p. 641 ["where, as with the parental-benefit exception, 'the appellate court will be evaluating the factual basis for an exercise of discretion, there likely will be no practical difference in application of the two standards' " of review].)

Here, the juvenile court found that father visited "fairly consistently." This finding is supported by substantial evidence. While father's visitation was not perfect, father regularly visited the children over the course of the years-long dependency.

But we do not find substantial evidence supports the court's findings concerning the benefits to the children from continuing the relationship with father, or the detriment to the children of terminating the relationship. The court concluded that father did not "know his children's medical needs. Hasn't attended any dental or medical appointments. He never asked anyone to attend. Has not risen to the level of a parent." While focusing on whether father occupied a "parental role" in the children's lives, equating that role with attendance at medical appointments, and understanding their medical needs, the court said nothing about the attachment between father and his children. *Caden C.* made clear the beneficial relationship exception is *not* focused on a parent's ability to care for a child or some narrow view of what a parent-child relationship should look like. (*Caden C.*, *supra*, 11 Cal.5th at

10

p. 632.)  Instead, the focus is whether there is a substantial, positive emotional attachment between the parent and child.

The Department's reports gave the court little evidence about the quality of the visits between father and the children, or how the children felt about father.  The children were rarely, if ever, asked how they felt about father or whether they enjoyed visits with him.  "[S]ocial worker assessments and evaluations should address whether or not the children have a substantial, positive, emotional attachment to the parents taking into consideration the child's age, the portion of the child's life spent in parental custody, the positive or negative impact of interaction with the parent, and the child's particular needs as required by *Caden C*." (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1230, fn. 5; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575–576.)  The reports here did not adequately address these factors.

What the record *did* include was father's testimony the children wanted to be returned to him, and that the youngest child cried when visits concluded.  D.M. had lived with father for nearly eight years of her young life, R.M. for nearly five years, and I.M. for nearly two years, in an intact family where father was a breadwinner and custodial parent.

The court's express findings that father did not act like a parent demonstrate it considered factors which *Caden C*. has explained are inappropriate in determining whether the parental-benefit exception applies.  (See *Caden C., supra*, 11 Cal.5th at pp. 632–633; *In re B.D.*, *supra*, 6 Cal.App.5th at pp. 1230–1231; see also *In re Charlisse C.* (2008) 45 Cal.4th 145, 159 [a "disposition that rests on an error of law constitutes an abuse of discretion"].)

The Department argues any error was harmless because father did not satisfy the elements of the exception to the termination of his parental rights.  We are not persuaded.  We

cannot know how the court would have exercised its discretion if it had the benefit of the *Caden C.* analysis when making its ruling. We believe the juvenile court should make this determination in the first instance. (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1194.)

## DISPOSITION

The orders terminating parental rights are reversed. The matter is remanded for the juvenile court to conduct a new Welfare and Institutions Code section 366.26 hearing in conformance with the principles articulated in *Caden C.*, *supra*, 11 Cal.5th 614.

GRIMES, Acting P. J.

WE CONCUR:

STRATTON, J.

WILEY, J.