Filed 3/8/13  In re H.C. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re H.C. et al., Persons Coming Under the Juvenile Court Law. | |
| L.C., | E056350 |
| Plaintiff and Appellant, | (Super.Ct.No. INJ016246) |
| v. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Defendant and Respondent. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E056552 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ016246) |
| v. | OPINION |
| T.C., | |
| Defendant and Appellant. | |

1

APPEAL from the Superior Court of Riverside County. Charles Everett Stafford, Jr., Judge. Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Plaintiff and Appellant L.C.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant and Appellant TC

Pamela J. Walls, County Counsel, Anna M. Deckert, Deputy County Counsel, for Plaintiff, Defendant, and Respondent.

Leslie A. Barry, under appointment by the Court of Appeal, for Minors.

This opinion addresses two appeals that have been consolidated. The first appeal is brought by T.C. (Mother), who is the mother of H.C. and A.C. (collectively "the children"). The second appeal is brought by L.C. (Cousin), who is Mother's cousin—the children's second cousin. The juvenile court terminated Mother's parental rights to the children. (Welf. & Inst. Code, § 366.26, subd. (b)(1).)[1] Additionally, the juvenile court (1) suspended visitation between Cousin and the children, (2) ordered the children's permanent plans to be adoption by their caregivers, and (3) denied Cousin's request to place the children with Cousin (§ 388).

Cousin contends the juvenile court erred because (1) it failed to follow the statutory requirements concerning relative placement (§ 361.3), and (2) it was in the children's best interests to be placed together, in order to preserve their sibling bond.

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code, unless otherwise indicated.

Mother contends the juvenile court erred because it "did not adequately assess and evaluate the suitable and available relative placement with maternal cousin." We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### A.     BACKGROUND

Mother had six children: T.C., L.W., M.W.1, M.W.2, H.C., and A.C. In August 2004, after giving birth to M.W.1, Mother tested positive for methamphetamine. In 2005, Mother's parental rights to M.W.1 were terminated. M.W.1 lived in a prospective adoptive home. In January 2006, Mother's reunification services for L.W. were terminated, and L.W. was placed in his father's custody. In September 2006, Mother's parental rights to M.W.2 were terminated. Cousin adopted M.W.2. In April 2007, Mother's reunification services for T.C. were terminated, and T.C. was placed in the custody of her father.

H.C. is female and was born in December 2009. Mother was unable to provide any identifying information for H.C.'s father. A.C. is male and was born in July 2011. A.C.'s alleged father asked the Riverside County Department of Public Social Services (the Department) for a paternity test because Mother "dated several people at the same time" she was dating him.

### B.     DETENTION

On July 21 and 22, 2011, the Department received referrals concerning A.C. Mother had given birth to A.C.; who was in respiratory distress and placed in neonatal intensive care. Mother did not know she was pregnant and had not received prenatal

3

care.  Mother admitted using methamphetamines during the pregnancy and stated she had been homeless at one point.  Mother and A.C. tested positive for methamphetamine.  Mother wanted A.C.'s father to have custody of A.C.  A.C.'s father did not come to the hospital for the birth, or to visit A.C.

Mother told a Department social worker, "'I drink meth, but I don't use every[]day.'"  Mother refused to tell the Department where H.C. was located; she feared the Department would take custody of H.C.  After an Indio police officer spoke to Mother, Mother told the Department H.C. was with a friend.  H.C. was eventually located with a different friend, and taken into the Department's custody.  A.C.'s alleged father was not willing to care for A.C. until the paternity test was completed.  The Department took custody of the children.

The Department filed a petition alleging the children were at substantial risk of suffering harm due to Mother neglecting the children as a result of her substance abuse.  (§ 300, subd. (b).)  The Department further alleged the children's fathers left them without any provision for support.  (§ 300, subd. (g).)  The juvenile court found the children came within section 300, in that the children needed to be removed from Mother's care to protect them from a risk of substantial harm.  The court ordered the children be detained and placed with a relative or in foster care.  Additionally, the court ordered supervised visitation between Mother and the children to occur a minimum of once per week.

C.     JURISDICTION/DISPOSITION

H.C. was placed in a foster home in the San Gorgonio Pass area. H.C. appeared fearful when her foster parent would attempt to wash H.C.'s genitals. A.C. was placed in a foster home in the Coachella Valley. A.C. appeared healthy and was doing well in his placement. In August 2011, the Department tried to contact Cousin to inquire about her interest in taking custody of H.C., since Cousin adopted M.W.2; however, the Department did not have a current telephone number for Cousin.

The Department interviewed Mother. Mother explained she did not receive prenatal care for A.C. because "she had been living on the streets at the time and she did not have any income or insurance." Mother stated she had been unemployed for "a couple of years" and was currently unemployed. Mother received food stamps, but no other types of assistance. No visits took place between Mother and the children due to Mother missing a scheduled visit and not making another appointment. A.C.'s alleged father missed three paternity testing appointments.

Mother requested the children be placed with (1) a paternal great-aunt; (2) a paternal cousin; or (3) a maternal great-aunt. The Department submitted a referral for the paternal grandmother, to be assessed for placement of A.C., but the assessment ended when she decided she did not want to be considered for placement.

The juvenile court found the allegations in the petition to be true. The court sustained the petition and adjudged the children wards of the court. The juvenile court denied Mother reunification services due to Mother failing to reunify with the children's siblings and/or half-siblings, and Mother's parental rights being terminated to two of her

5

children.  (Former § 361.5, subds. (b)(10) & (11) [eff. Jan. 1, 2011].)  The court found A.C.'s father, to be an alleged father; he was dismissed from the case.

The juvenile court found H.C. and A.C. were a sibling group with their siblings, who were still under the juvenile court's jurisdiction.  The court reasoned the children were a sibling group because "at least one child in the group was under the age of three at the time of the initial removal and all of the children were removed from parental custody at the same time"—given the juvenile court's last remark, it appears the court considered H.C. and A.C. to be a sibling set by themselves, without Mother's other children, who were wards of the court.  The court found efforts were being made to place the children together.

D.    MOTIONS

On October 28, 2011, the Department moved for the juvenile court to order weekend and holiday visits between Cousin and the children.  The Department felt it was in the children's best interests to be placed with family, and Cousin wanted to get to know the children in order to determine if she was interested in adopting them.  The court granted the Department's motion.

Two weeks later, on November 14, A.C.'s foster parents moved for de facto parent status.  One week later, on November 21, A.C.'s foster parents moved to be designated prospective adoptive parents.  On December 5, the children's attorney (Cote) moved the juvenile court to suspend visitation between Cousin and the children.  Cote explained that she initially supported the Department's motion for visitation, but came to realize the motion was based on information that was no longer correct.  Specifically,

6

Cousin was only interested in adopting A.C., but Cousin had initially indicated she would be interested in adopting both. Cote explained A.C.'s foster family was interested in adopting both children, if their home could be approved for both.

Further, Cote stated H.C. was not visiting Cousin; and when H.C. had recently been removed from her placement Cousin was unwilling to take H.C. Cote argued the visitation between Cousin and the children was unnecessary because (1) Cousin does not fall within the statutory category of relatives who should receive preferential treatment (former § 361.3, subd. (c)(2)); (2) the children have "no connection with [Cousin] other than some remote biological relationship"; (3) there is no relationship between H.C. and AC; (4) there is no relationship between the children and M.W.2; and (5) A.C.'s foster parents had various motions pending in the juvenile court (described *ante*).

Mother's attorney made no comment in response to Cote's argument. The Department did not join in Cote's request because it did not appear anything detrimental was taking place during the visits. The court denied without prejudice the motion to suspend visitation because the court was "not hearing that there is any detriment." On December 14, the juvenile court granted A.C.'s foster parents' request for de facto parent status.

E.     OBJECTIONS TO PLACEMENT WITH COUSIN

AC was doing well in his foster placement. H.C. was adjusting well in her new foster placement. Mother did not visit the children. The children visited Cousin every other weekend. Cousin requested, through the Department, that A.C. be placed in her

custody. Cousin felt H.C. was "too much for her to handle." In January 2012, the Department informed Cote of its intent to remove the children from their foster homes and place them in Cousin's home.

Cote filed an objection to A.C.'s removal. Cote argued it was not in A.C.'s best interests to be removed from his foster parents' home because (1) they were the only family A.C. knows, (2) A.C. was bonded to his foster family, (3) the foster parents had de facto parent status and were waiting for prospective adoptive parent status, (4) the foster parents had always expressed a willingness to adopt A.C., (5) Cousin only visited A.C. two times, (6) A.C. had no bond with Cousin, and (7) A.C. did not have a bond with H.C.

Cote filed a separate objection to H.C.'s removal from her foster family's home. Cote argued it was not in H.C.'s best interests to be removed from her foster placement because (1) H.C. "suffered greatly" in her prior placement and was just beginning to show improvements in the current placement, (2) Cousin had "steadfastly indicated" she was not interested in adopting H.C., (3) Cousin did not take custody of H.C. when H.C. had to be removed from her prior foster placement due to an emergency, (4) there was no bond between Cousin and H.C., and (5) there was no bond between A.C. and H.C.

AC's de facto parents also filed an objection to A.C.'s removal from their home. The de facto parents asserted A.C. had been in their home since he was 17 days old, there was no basis for removal, and Cousin was a "virtual stranger" to A.C. and "a distant relative."

The Department argued the children should be placed with Cousin. The Department argued Cousin's home was the best placement for the children because they could be placed together with their half-sibling, M.W.2. The Department asserted Cousin was "fully committed" to both children and understood the placement was a "lifetime commitment."

On January 17, 2012, the juvenile court held a hearing on the issue of removing the children from their placements. At the hearing, Cote argued H.C. had "special emotional needs." Cote asserted H.C. was improving in her new placement, and the switch to living with Cousin might cause a setback in H.C.'s progress. Cote argued Cousin only visited with H.C. one time, and with A.C. two times—Cousin had contacted the Department and requested H.C. not be at the second visit. Cote further argued there had not been visits occurring between H.C. and A.C.

The Department confirmed Cote was correct about the number of visits; it argued it was the Department's prerogative to make placement changes, and that it was not a decision to be made by the court. The Department stated it was its intention to move the children into Cousin's home. The Department again stressed placement transfers were within the Department's discretion, and the standard for reviewing the Department's transfer decisions is abuse of discretion. The Department asserted there was no evidence indicating it was abusing its discretion.

The juvenile court found it was not in the children's best interests to be removed from their placements; it did not state the reasons for its decision. The court ordered visitation between Cousin and the children could continue.

9

F.    REQUESTS TO CHANGE A COURT ORDER

On February 21, 2012, Cote filed a request to change the court's order concerning visitation between Cousin and the children. (§ 388.) Cote argued the visits were harming the children because (1) the children were confused by the visits, and (2) the visits disrupted the children's regular routines. For example, H.C. was angry and emotionally detached when she returned to her foster parents after a four-day visit with Cousin. H.C. also smelled foul after the four-day visit and was dirty. The clothes the foster parents sent with H.C. were returned in a plastic bag and it appeared they were soaked with urine. H.C. had trouble sleeping after she returned to her foster parents' house; she woke twice during the night crying, like she had when she initially arrived at their home three months prior. At daycare, H.C.'s naps were disturbed by "'day terrors.'" H.C. appeared to stabilize after being back with her foster parents.

As to A.C., it was asserted the visits were detrimental because he was not given his regular naps while with Cousin, so he had difficulties sleeping and eating upon his return to his foster parents, which caused him to wake up during the night. A.C. returned from the visits with colds—after the first visit, A.C. had a cold that lasted for three weeks.

The juvenile court ordered a hearing on the request to change the court's order. On February 23, 2012, the court suspended the visits between Cousin and the children pending the outcome of the hearing.

On March 5, 2012, Cousin filed a request to change a court order. (§ 388.) Cousin asserted she wanted A.C. and H.C. placed with her. Cousin explained she did

10

not have many visits with the children due to the children's foster parents cancelling the appointments. Cousin argued the children should be placed with her because (1) Cousin is the children's relative, and (2) the children's half-sibling is in Cousin's care.

AC's de facto parents filed an objection to Cousin's request to change a court order. The de facto parents asserted there was no longer a preference for relative placement because the case was in the permanency planning stage. The de facto parents further argued it was not in A.C.'s best interests to be placed with Cousin. The de facto parents denied hindering the visits between A.C. and Cousin. The de facto parents explained there were communication problems with the social worker that led to missed visits and visits taking place on short notice. The Department's report reflected a new social worker was assigned to the case on February 28, 2012.

After a different social worker took over the case, the Department changed its position and supported the children's requests to stay in their placements. The Department argued Cousin's request for placement should be denied because Cousin had been "hesitant from the beginning" in taking custody of H.C. due to H.C.'s tantrums and the financial expenses related to daycare. The Department also asked the court to designate A.C.'s de facto parents as prospective adoptive parents.

The juvenile court remarked that the children were both under the age of three years old. A.C. was seven months old, and H.C. was two years old. The court found the children had bonded with their foster parents, but that the children had not connected with their various older siblings. The juvenile court explained that it was a goal to keep siblings together and place children with relatives, "[b]ut sometimes the

11

situations are presented that we get to a point in time that that's not always possible and doesn't serve the interests of the children. And this is one of those occasions." The court found it would be detrimental to the children to remove them from their foster placements, because the children were in stable environments and removal would require the children to "start the bonding process all over again." The court observed that removing the children to Cousin's house might be in the best interests of Cousin, but it would not be in the children's best interests.

The court denied Cousin's request to change a court order on the basis that there were not changed circumstances and the requested change was not in the children's best interests. (§ 388.) Further, the court designated A.C.'s de facto parents as prospective adoptive parents because the designation was in A.C.'s best interests. The court ordered the children's permanent plan to be adoption by their caregivers. The court suspended visitation between Cousin and the children, but denied, without prejudice, Cote's motion to terminate visitation with Cousin.

G.     TERMINATION

The children were doing well in their placements. The Department recommended Mother's parental rights be terminated. The juvenile court terminated Mother's parental rights to the children, A.C.'s alleged father's parental rights, and H.C.'s unknown father's parental rights. The court found adoption was in the children's best interests.

## DISCUSSION

A.    SECTION 361.3:  COUSIN'S APPEAL

Cousin contends the trial court erred by failing to apply the relative placement preference (§ 361.3) during the hearing on Cousin's request to change a court order (§ 388).[2]  We disagree.

Former section 361.3, subdivision (a), provided:  "In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative.  In determining whether placement with a relative is appropriate, the county social worker and court shall consider, but shall not be limited to, consideration of all the following factors[.]"  (Eff. Jan. 2008.)

Former section 361.3, subdivision (d), sets forth:  "Subsequent to the hearing conducted pursuant to Section 358 [(the disposition hearing)], whenever a new placement of the child must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements."  A juvenile court's alleged legal errors, such as failing to follow proper legal procedures, are reviewed de novo.  (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159.)

---

[2]  Within this argument, Cousin also devotes one sentence to the assertion that the juvenile court erred by denying placement with Cousin "without substantial evidence that an appropriate investigation of the placement with [Cousin] was ever conducted."  This argument appears to be an afterthought, as it is only one sentence mixed into the separate contention concerning the juvenile court failing to apply the law of section 361.3.  Accordingly, we do not address this issue.

The disposition hearing in this case took place on September 19, 2011. Cousin filed her request to change a court order on March 5, 2012. The hearing on the request took place on March 20, 2012. At the time of the March 20, 2012 hearing, A.C. continued to reside with the same foster family he had been with since he was 17 days old, and H.C. continued to reside with her second foster family. In other words, at the March 20 hearing, the children had not been removed from their homes. As a result, the March 20 hearing was not one in which a new placement of the children needed to be made. (§ 361.3, subd. (d) ["whenever a new placement of the child must be made"].) Accordingly, since the section 388 hearing took place after the disposition hearing and the children were still residing in there foster placements, section 361.3 did not apply to the March 20 section 388 hearing. Thus, we conclude the juvenile court did not err.

In a mixed argument, Cousin asserts the juvenile court erred because it failed to apply section 361.3 and it made a decision about the children's placement without evidence of the Department assessing Cousin's home. Cousin does not explain why the juvenile court was legally required to apply section 361.3 during a postdisposition hearing where the children had not been removed from their placements. Thus, we find Cousin's argument to be unpersuasive.

B.      SECTION 361.5:  MOTHER'S APPEAL

Mother asserts the juvenile court erred because it "did not adequately assess and evaluate the suitable and available relative placement with maternal cousin in deciding that the best interest of the children was to remain in their separate foster home

14

placements." Mother appears to concede that section 361.3 does not apply in this case, and therefore her argument relies on section 361.5.[3]

Mother specifically relies on former section 361.5, subdivision (g)(1)(D), which provided: "Whenever a court orders that a hearing shall be held pursuant to Section 366.26 . . . it shall direct the agency supervising the child and the licensed county adoption agency . . . to prepare an assessment that shall include: . . . [¶] . . . [¶] (D) A preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or guardian . . . . If a proposed guardian is a relative of the minor, the assessment shall also consider, but need not be limited to, all of the factors specified in subdivision (a) of Section 361.3 and in Section 361.4." (Eff. Jan. 2011.) Given this law, Mother asserts the juvenile court erred in making a placement decision for the children without an assessment of Cousin's home having been conducted by the Department.

"Prospective Adoptive Parent" is a defined term in former section 366.26, subdivision (n)(1), which provides that a juvenile court "may designate a current caretaker as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process."

---

[3] In a section of Mother's opening brief she seems to change positions and assert section 361.3 *does* apply in the instant case. To the extent Mother is asserting the juvenile court should have applied section 361.3, we have addressed that issue *ante*.

The children did not live with Cousin for six months, so Cousin could not be a prospective adoptive parent. (Welf. & Inst. Code, §366.26, subd. (n)(1); see also Fam. Code, § 8731 [six-month requirement for prospective adoptive parent].) Additionally, there is nothing in the record indicating Cousin is the children's guardian. Accordingly, Cousin does not qualify as an "identified prospective adoptive parent or guardian," such that a home study of Cousin's house needed to be conducted. (Welf. & Inst. Code, § 361.5, subd. (g)(1)(D)). In other words, the juvenile court did not err.

Mother discusses the Department's failure to initially contact Cousin when the children were removed from Mother's care. Mother seems to assert the children could have been placed with Cousin if the Department had tried harder to contact Cousin. The record reflects the Department tried to contact Cousin prior to the Jurisdiction/Disposition hearing, but the telephone number it had for Cousin was not in service. When the Department interviewed Mother prior to the Jurisdiction/Disposition hearing, Mother suggested three different relatives for placement of the children—Cousin was not among them. Given that Mother did not attempt to have the children placed with Cousin earlier in the case, we are not persuaded by her current complaint that the Department did not try hard enough to have the children placed with Cousin prior to the Jurisdiction/Disposition hearing.

Moreover, we note the Department tried to place H.C. with Cousin in November 2012, after the Jurisdiction/Disposition hearing, but Cousin declined the placement explaining that H.C. was "too much for her to handle." Thus, the Department made an

effort to place H.C. with Cousin; as a result, Mother's arguments concerning the Department's lack of effort are unavailing.

      C.      <u>SECTION 388:  COUSIN'S APPEAL</u>

Cousin asserts the juvenile court's ruling on her section 388 petition should be reversed because it was in the children's best interests to be placed together, with M.W.2, in Cousin's home.  Cousin's best interest argument is moot because she does not address the "change circumstances" prong of the section 388 analysis.

"When no effective relief can be granted, an appeal is moot . . . ."  (*In re Jessica K.* (2000) 79 Cal.App.4th 1313, 1315-1316.)  "A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child.  [Citation.]"  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)

In denying Cousin's section 388 request, the juvenile court said, "And it's denied because there is not a change of circumstance sufficient to warrant the granting and the granting of that [JV-]180 petition would not be in the best interest of either one of these children."  Cousin's appeal only addresses the best interest prong of the analysis. Therefore, even if Cousin were correct in her contention, this court could not provide her the relief she seeks because the "changed circumstances" prong would prevent reversal of the juvenile court's decision.  In other words, the juvenile court would have needed to have erred as to both prongs in order for its decision to be reversed.  Since Cousin is only asserting an error with the "best interests" prong, this court cannot

17

reverse the juvenile court's decision even if Cousin's contention is correct.  Thus, the issue is moot.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
        J.


We concur:


RICHLI
      Acting P. J.


KING
      J.