Filed 6/1/22; certified for publication 7/1/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re M.G., a Person Coming Under the Juvenile Court Law. | B313483 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 17CCJP02830A) |
| Plaintiff and Respondent, | |
| v. | |
| MELINA S. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stacy Wiese, Judge. Reversed with directions.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant Melina S.

Karen B. Stalter, under appointment by the Court of Appeal, for Defendant and Appellant Francisco G.

Dawyn Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Melina S. (Mother) and Francisco G. (Father) challenge the juvenile court's June 3, 2021, order terminating parental rights for their son M.G. (born 2017). They contend the juvenile court did not conduct a correct beneficial parent-child relationship analysis as set out in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) and instead considered factors *Caden C.* deems improper. They urge us to reverse the order terminating parental rights and remand the matter for a new hearing under Welfare & Institutions Code section 366.26[1] using only the correct *Caden C.* factors. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

Now four-year-old M.G. is fed through a G-tube due to his diagnoses of esophageal reflux, generalized intestinal dysmotility, and laryngomalacia. He is also eligible for Regional Center Services due to developmental disability. Both parents are Regional Center consumers due to their developmental disabilities and former foster children. Because their ability to care for M.G. is impaired, Vilma L., Father's longtime childhood In Home Support Specialist from the Regional Center, was initially M.G.'s primary caregiver.

On December 7, 2017, it was reported to the Los Angeles Department of Children and Family Services (DCFS) that Mother hit Vilma with a closed fist while Vilma was placing the child in his car seat. At the time of the referral, parents were receiving voluntary family maintenance services through DCFS. Vilma

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

later explained problems occurred when the parents did not take their medications and Mother was impatient, angry, worried, afraid and aggressive that day while they were waiting for Father to be treated at a local clinic for a medical problem.

On December 19, 2017, the parents brought M.G. to UCLA Medical Center for a G-tube procedure as he was not thriving. The hospital social worker perceived the parents as children themselves due to their cognitive delays. The parents did not know M.G.'s feeding schedule and told the treating physician they were aggressive and hit each other. Vilma was no longer willing to care for M.G. and worried about parents' ability to care for him without help. The physician was concerned that M.G. would fail to thrive under their care. Consequently, on December 26, 2017, when M.G. was ready for discharge from the hospital, a protective custody warrant was secured placing him on a hospital hold. The parents were informed that the child would be temporarily placed in a medical foster home. He was so placed.

On December 29, 2017, DCFS filed a petition under section 300, subdivisions (a) and (b), alleging that on December 6, 2017, Mother and Father engaged in a violent altercation in the child's presence when Mother struck Father and Vilma. The petition also alleged Mother is diagnosed with schizophrenia, bipolar disorder, ADHD and anger management problems and Father suffers from depression and anger management problems. These conditions allegedly rendered them incapable of providing M.G. with regular care.

At the detention hearing on January 2, 2018, the juvenile court detained M.G. and parents were permitted monitored visitation of at least three hours or three times a week.

By the time of the adjudication hearing two months later on March 19, 2018, Mother had reported she was taking her medication and did not hit Father anymore. Father confirmed that and stated he was taking his medication as well. Both parents admitted they needed help with the G-tube. Vilma offered to allow them to live with her as they could not take care of the child on their own. Regional Center staff familiar with the parents reported Father was compliant with his meds, needed support and independent living skills assistance, and would "freak out" if M.G. started to cry. Mother suffered from autism, mild intellectual disability, mood swings and agitation. Both parents took psychotropic medication for their mood swings, angry outbursts, and hallucinations. Both parents participated in monitored visitation.

Mother pleaded no contest to the petition which the court sustained as to both parents under section 300, subdivision (b) (failure to protect). The sustained (b) count alleged mother and father have violent altercations and mental and emotional problems and developmental delays rendering them incapable of caring for M.G. The juvenile court ordered M.G. removed from the custody of his parents, and ordered reunification services and monitored visitation for both parents.

At the six-month review on September 17, 2018, M.G. was reported to be thriving in foster care. He was eligible for Regional Center services and received occupational therapy and early intervention services. Mother was in compliance with her case plan, which included anger management, domestic violence and parent education classes. Father was dismissed from anger management classes after four absences, but was in a new program. Both parents were renting a bedroom from a third

party and were scheduled to receive medical training for G-tube feedings. Visitation was regular, appropriate, and ongoing.

There was another domestic violence incident in January 2019 when Father jumped on mother and was choking her. The parents had to move out of their residence because of their domestic violence. Father's previous life skills coach reported the relationship was toxic. Father had said on numerous occasions, including in his anger management classes, he did not want M.G. back. Both parents required redirection and had to be prompted on how to interact with M.G. during visitation. But their visits were regular and appropriate.

Although discharged from anger intervention services due to aggressive behavior after he had completed 22 of 26 sessions, Father enrolled in a new anger management and domestic violence program and also completed a 12-week parenting class. Mother continued to be in compliance.

At the 12-month review on April 25, 2019, the court considered returning M.G. to his parents. The court heard witness testimony from both parents and Natalia S., Mother's Supportive Living Coach employed with the Regional Center. Natalia S. testified Mother played games with M.G., engaged him and taught him how to stack items. Mother did not, however, operate the feeding tube during visits. At the hearing, both parents denied the January 25, 2019, domestic violence incident. The juvenile court found it premature to return M.G. to his parents, expressing concern about their ability to manage the G-tube and their domestic violence. It also found that the January 25, 2019 choking incident did occur. The court found both parents had substantially complied with their programs. DCFS

5

was ordered to ensure the parents lived apart and were trained on managing the G-Tube.

Father completed anger management, domestic violence, and parenting programs by May 2019. From February through June, 2019, a human services aide had observed 29 weekly visits during which both parents appropriately played with, redirected and soothed M.G, who was responsive to them. Both parents were visiting two hours twice a week without the help of their respective life coaches. They still needed some assistance in how to interact with M.G. and manage the G-tube.

At the same time, the caregivers were reporting that M.G. was showing a strong attachment to them and did not respond well when they were not present. During the summer of 2019, M.G.'s foster mother became concerned about his aggression. He would bite himself, hit his head, jump wildly on the bed and rock back and forth. He was referred for an autism evaluation.

Between September and December, 2019, parents received more training on operating the G-tube, but each was still experiencing difficulty with it.

At the next hearings on January 6 and 15, 2020, the juvenile court made several findings. First, it found parents "mostly compliant" with the case plan. "But the really critical issue is can the parent apply what they learned so the child can be returned to a safe home." The court recounted all efforts extended to train parents on operating the G-tube, characterized those efforts as "reasonable," and found "there is a very strong indicator that the parents have not, and unfortunately will not be able to master the handling of the G-tube." The court also noted the parties were at the 24-month mark in reunification services and the court did not have discretion to extend services beyond

that date. "I don't see that the parents can safely master this G-tube handling. There is no definite time period that I can see if I gave this extra amount of time that the parents would be able to master his G-tube handling." The court found parents' progress toward alleviating the causes of dependency insubstantial, terminated reunification services over the objections of both parents, and ordered a section 366.26 permanent placement hearing. At parents' request, the court also appointed an expert under Evidence Code section 730 to evaluate the bond between M.G. and his parents.

Although reunification services were terminated in January 2020, parents continued to visit M.G. consistently at least twice a week, resorting to video chats during the pandemic as his pediatrician allowed no visitors due to M.G.'s medically fragile condition. Engaging three-year-old M.G. over video was difficult for parents due to his hyperactivity and lack of attention.

One year elapsed from the termination of reunification services. Visitation continued by video. By January 2021, M.G.'s caregivers wanted to adopt him as he had been in their care since 2018 and they had a strong bond to each other.

By May 20, 2021, the bonding study by psychologist Geraldo D. Canul, Ph.D., was completed over a year after it was ordered and after one year of physical separation due to the pandemic. On May 14, 2021, Dr. Canul interviewed the parents, and on May 17, 2021, he observed the parents and M.G. over video during their weekly video visit. Dr. Canul found the parents and M.G. to be comfortable with one another. The parents were attentive, eager, and encouraging. M.G. appeared distracted and disinterested in interacting with his parents. He needed to be redirected frequently. Dr. Canul concluded there

was "minimally positive emotional interdependence" between the minor and the parents. "The nature and quality of their relationship is minimally positive." He reported, "In order for the child to more fully develop physically, socially, and psychologically [M.G.] will need to live in a stable and consistent home and with caregiver(s) who are able to be responsive to his numerous developmental, psychological, and medical needs."

At the 366.26 permanent placement hearing on June 3, 2021, the juvenile court found the minor adoptable. Both parents asserted the beneficial relationship exception. The court noted that the bonding study "[b]asically indicated that there was not really a bond between the parents and the child." The juvenile court found: "They do want to continue being in his life, but they have not acted in a parental role" and "[t]hey have not established a bond with the child such that the parental rol[e] can be viewed by this court in a positive ma[nn]er." The court terminated all parental rights and set the matter for a permanency planning hearing on December 2, 2021.

Both Mother and Father filed timely notices of appeal from the order terminating parental rights.

## DISCUSSION

A.    *Applicable Law*

At a section 366.26 hearing, when the juvenile court has already found the child cannot be returned home within the time limits set by the statute, the court then determines by clear and convincing evidence whether the child is likely to be adopted. If the court so finds, the court is statutorily required to terminate parental rights unless there is a compelling reason to find that termination of parental rights would be detrimental under one of

8

the six exceptions enumerated in section 366.26, subdivision (c)(1)(B). (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206–207). The burden of establishing an exception to termination rests with the party claiming the exception. (*Id*. at p. 207.)

One of the six exceptions is the parental-benefit exception in section 366.26 (c)(1)(B)(i), which applies where a parent has maintained regular visitation and contact, has established a positive emotional bond with the child, and the child would benefit from continuing the relationship to such a degree that the child would be greatly harmed by termination. (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.)

*Caden C.* recently clarified how the trial court must view elements of the beneficial relationship exception. The question presented there was "whether a parent must show progress in addressing issues such as drug abuse that led to the child's dependency in order to establish the exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 629.) In *Caden C.*, the court of appeal had found no parental-benefit exception because the parent continued to struggle with substance abuse and mental health issues which were the cause of the minor's dependency. The court treated the lack of progress in addressing these issues as a categorical bar to establishing the exception. The *Caden C.* Court found consideration of these issues mistaken and reversed. (*Id*. at pp. 625–626.)

*Caden C.* began with a summary of the purpose of a placement hearing under section 366.26. It noted that when a court orders such a hearing, reunification services have been terminated and the assumption is that the problems that led to the court taking jurisdiction have not been resolved. The question before the court is decidedly not whether the parent may

9

resume custody of the child. (*Caden C.*, *supra*, 11 Cal.5th at pp. 629–630.) Instead, the goal is to select and implement a permanent plan for the child; the hearing determines only the type of permanent home. The first decision the court must make at the hearing is whether the child is adoptable, and if so, to terminate parental rights. (*Id.* at p. 630.)

This is when the parental-benefit exception comes to bear. Three elements must be satisfied to establish the parental-benefit exception: 1) regular visitation and contact, taking into account the extent of visitation permitted; 2) a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and 3) a showing that terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights. In that case the court must select a permanent plan other than adoption. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636–637.) In assessing whether termination would be detrimental, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. (*Id.* at p. 632; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

The exception preserves a child's right to a relationship with the parents even when parent and child cannot safely live together. It also does not allow "a judgment about the parent's problems to deprive a child of the chance to continue a substantial, positive relationship with the parent." (*Caden C.,*

10

*supra*, 11 Cal.5th at p. 643.)  In determining whether a positive emotional relationship has formed, the focus is on the child's age and particular needs, the length of time the child has spent in parental custody and the positive and negative effects of interactions between parent and child.  The court must consider how the child speaks about, interacts with, or feels about his parents.  (*Id.* at p. 632.)

As to the third element of detriment, the court needs to determine "how the child would be affected by losing the parental relationship— in effect what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, 11 Cal.5th at p. 633.)  "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due* to' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.)

Significantly, the *Caden C.* Court noted "the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s).  Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent." (*Caden C., supra*, 11 Cal.5th at p. 634.) "Even where it may never make sense to permit the child to live with the parent, termination may be detrimental." (*Ibid.*)

The Court also noted the exception becomes relevant only when the parent has not made sufficient progress in addressing the problems that led to dependency.  That lack of progress, then, cannot categorically be used against the parent to deny the parental-benefit exception.  (*Caden C., supra*, 11 Cal.5th at p. 637.)  In that vein, whether the parent is or is not ready for the

11

child's return to parental custody is not, by itself, relevant to the application of the parental-benefit exception. (*Id.* at p. 638.)

It is unnecessary to show that the parent occupies a parental role in the child's life because a child can have a psychologically or emotionally significant relationship with the parents even if they do not occupy a parental role. (*Caden C., supra*, 11 Cal.5th. at pp. 632–633.) The focus, again, is on the child. That a child may have more than one person who stands in the role of parents does not defeat the exception; a strong relationship with one parental figure does not negate the harm the child would experience if the child were to lose a significant and positive relationship with the parents. (*In re S.B., supra*, 164 Cal.App.4th at p. 300.)

B.      *Standard of Review*

We review the juvenile court's findings using a hybrid approach. (*Caden C., supra*, 11 Cal.5th at pp. 639–641.) For the first two elements which require factual findings (parental visitation and the child's emotional attachment), we use " 'the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance.' " (*In re D.F.* (2020) 55 Cal.App.5th 558, 565; *In re A.M.* (2020) 47 Cal.App.5th 303, 314.) We review the evidence in the light most favorable to the juvenile court's findings and draw all reasonable inferences in support of those findings. (*In re J.N.* (2021) 62 Cal.App.5th 767, 774.)

12

For the legal question of how the court weighed the relative harms and benefits of terminating parental rights, which reflects "a delicate balancing of these determinations," we use the abuse of discretion standard. (*Caden C., supra*, 11 Cal.5th at p. 640.) A court abuses its discretion when it " ' "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) It is also an abuse of discretion to rest a disposition on an error of law. (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159.)

C.    *Analysis*

We examine the trial court's order in light of three elements of the beneficial relationship exception.

### 1.    Element 1: Regular Visitation

As to regular visitation, the trial court found Mother and Father had maintained regular, appropriate, and affectionate visits throughout the proceedings. This finding is unchallenged.

### 2.    Element 2: M.G.'s Emotional Attachment to His Parents

For this element, the juvenile court relied on the bonding study prepared by Dr. Canul. Dr. Canul interviewed the parents together for 90 minutes and then observed by video a weekly video visit between them and their son. Dr. Canul concluded that Mother "significantly underestimates the deficits and needs the minor has socially, in speech/language, and psychologically." As to Father, Dr. Canul found Father also "significantly underestimates the minor's deficits and needs in the areas [of] social development, language/speech skills, and psychologically." When Father promptly admonished M.G. several times for not

13

being attentive during the play session, M.G. "did not seem to understand that he was being admonished."

As to the interactions between parents and M.G., Dr. Canul wrote: "The minor's behaviors, developmental levels (psychological, emotional, social) are significantly below his expected age levels.  The minor appears to have minimally developed social skills and verbal skills.  He was minimally cooperative or responsive to the parents during the observation activities.  Both parents were eager to interact with the minor, but the minor reciprocated minimally to the parents prompts during the play session.  The minor required ongoing redirection in order to remain minimally interactive during the session."  He found "there is evidence to indicate the presence of a minimally positive emotional interdependence between the minor and the parents that has been developing."  Immediately after this finding, Dr. Canul concludes: "The minor's history, developmental-behavioral challenges, and medical diagnoses are significant.  The minor needs several medical, developmental - behavioral intervention, and mental health support in order to continue to develop."

In his final section entitled, "Recommendations," Dr. Canul stated: "The minor and the parents' relationship are minimally interactive and minimally reciprocal in a positive manner.  The parents have a significant low awareness of the minor's overall psychological, developmental, and emotional challenges and need for ongoing interventions.  [¶] The nature and quality of their relationship is minimally positive.  [¶] In order for the child to more fully develop physically, socially, and psychologically the minor will need to live in a stable and consistent home and with

14

caregiver(s) who are able to be responsive to his numerous developmental, psychological, and medical needs."

The juvenile court characterized this evaluation as finding "no bond" between parents and M.G.  On that basis, it declined to apply the parental-benefit exception.

The proper factors the study, at a minimum, should have considered, recognizing that rarely do parent-child relationships conform to an entirely consistent pattern, are set out in *Caden*: 1) the age of the child; 2) the portion of the child's life spent in the parent's custody; 3) the positive or negative effect of interaction between the parent and the child; and (4) the child's particular needs.  (*Caden C., supra*, 11 Cal.5th at p. 632.)  To that we add the child's and parents' particular abilities in expressing and establishing bonds.  The bonding study upon which the juvenile court relied did not analytically address these factors.

We find the bonding evaluation inexplicably terse and analytically uninformative, given the disabilities of all members of the family, M.G.'s tender age and inability to verbalize, and the constraints of one year of video-only contact and communication. The study offered minimal if any information about the nature of the child's relationship with his parents in the context of their developmental disabilities.  Indeed, we do not know how, if at all, the evaluator accounted for the family's disabilities when he observed them and found only a "minimally positive" bond.  The study simply summarizes his observations of a hyperactive three-year-old with developmental and expressive language delays interacting over a video chat.  There was no information in the reports informatively analyzing the parent-child interactions, a fatal lack of information.  (*In re J.D.* (2021) 70 Cal.App.5th 833 863–864.)

15

We understand that evaluating a parent-child bond with a three-year-old, non-verbal, below-age level developmentally disabled child visiting his developmentally disabled parents by video may be very difficult. But even a description of observations of M.G.'s interactions with his regular caregivers might have shed light on M.G.'s ability, if any, to interact and to express his emotions. The evaluation does not address this issue whatsoever.

Moreover, the close juxtaposition of Dr. Canul's observations about the interaction between parents and M.G. and his oft-expressed concern about M.G.'s developmental-behavioral needs leads us to question whether Dr. Canul actually evaluated the parties' emotional bonds, taking into consideration the pervasive developmental disabilities affecting all three, as opposed to opining only about the parents' ability to manage M.G.'s medical and developmental needs. Dr. Canul's comments lead us to the conclusion that he was, in essence, comparing caregivers, an improper consideration. (*Caden C., supra*, 11 Cal.5th at p. 634 [the section 366.36 hearing decidedly is "not a contest of who would be the better custodial caregiver."].)

Comparing a parent's attributes as a custodial caregiver relative to those of any potential adoptive parents is an improper factor because nothing that happens at the section 366.26 hearing allows the child to return to live with the parent. (*Caden C., supra*, 11 Cal.5th at p. 634.) The quality of the minor's attachment to his parents must be evaluated in the context of the contact they were permitted to have with him during the course of the dependency proceeding. In order to show they had a beneficial relationship with M.G., the parents did not

have to compete with the foster mother as to who would provide the minor with more appropriate care.

Given Dr. Canul's repeated concerns about M.G.'s other, non-emotional issues, we find there is no substantial evidence presented to support a determination that the parents and M.G. lack a positive, *emotional* relationship with each other. We arrive at this conclusion gingerly, as we are not in the business of re-weighing the evidence or substituting our own findings for those of the trial court. We simply hold that this report, which focuses on the necessity of caregivers savvy enough to provide for M.G.'s necessary medical, behavioral, and social interventions, does not provide substantial evidence to support a ruling that no emotional bond exists between parents and M.G.

### 3. Element 3: Balancing Termination with the Benefit of Adoption

This element requires the court to determine " 'how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life.' " (*Caden C., supra*, 11 Cal.5th at p. 640; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1225.) If severing the natural parent-child relationship exception would deprive a child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated. (*In re B.D.,* at pp. 1225–1226.)

Given our ruling that substantial evidence does not support the finding of "no bond," it is unnecessary for us to review the trial court's findings as to the third element. We do note, as set out above, that the trial court's comments focus on the parents' inability to assume parental roles as if that is a determining

17

factor in deciding whether M.G. would be harmed if the relationship with his parent were terminated. The focus is not on whether M.G.'s parents can assume their parental roles; as *Caden C.* reminded us, that ship sailed when reunification services were terminated and the 366.26 hearing was set. The focus with the third element is on whether to break the emotional bond, if the court finds, on remand based on sufficient evidence, that there is a positive, emotional attachment that the child would benefit from continuing. (*In re D.M.* (2021) 71 Cal.App.5th 261, 271 [the court's "express findings that father did not act like a parent demonstrate it considered facts which *Caden C.* has explained are inappropriate in determining whether the parental-benefit exception applies."].) When a juvenile court bases its decision to terminate parental rights on improper factors, the trial court abuses its discretion. (*In re Charlisse C.*, *supra*, (2008) 45 Cal.4th at p. 159; *In re D.M.,* at p. 271.) On remand, whether the parents can fulfill parental roles is not a factor for the juvenile court to consider.

## DISPOSITION

The order terminating parental rights is reversed.  The matter is remanded for the juvenile court to conduct a new 366.26 hearing in conformance with the principles articulated in *In re Caden C.*

STRATTON, P. J.

We concur:

GRIMES, J.

HARUTUNIAN, J.[*]

---

[*]    Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 7/1/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re M.G., a Person Coming Under the Juvenile Court Law. | B313483 |
| | (Los Angeles County Super. Ct. No. 17CCJP02830A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | ORDER CERTIFYING OPINION FOR PUBLICATION |
| v. | [NO CHANGE IN JUDGMENT] |
| MELINA S. et al., | |
| Defendants and Appellants. | |

THE COURT:

The opinion in the above-entitled matter filed on June 1, 2022, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports.

[There is no change in the judgment.]

_____

STRATTON, P. J.          GRIMES, J.          HARUTUNIAN, J.*

_____

*        Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.