Filed 9/25/24  In re C.C. CA2/7

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re C.C., a Person Coming Under the Juvenile Court Law. | B335806 |
| | (Los Angeles County Super. Ct. No. 18CCJP00235) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. HECTOR C., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

———————————————

## INTRODUCTION

Hector C., the father of C.C. (born October 2015), appeals from the juvenile court's order terminating his parental rights under Welfare and Institutions Code section 366.26.[1] Hector contends he established the beneficial parental relationship exception to the termination of his parental rights, and that the juvenile court abused its discretion in failing to apply the exception. (§ 366.26, subd. (c)(1)(B)(i).) We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Prior Dependency Proceedings*

Hector and Isabel C. are C.C.'s parents. The family was involved in dependency proceedings from 2018 to 2019 after being referred to the Los Angeles County Department of Children and Family Services (Department). In 2018, then two-year-old C.C. was removed from Hector's custody (and also from Isabel, who is not a party to this appeal). The juvenile court sustained a section 300 petition based on domestic violence between Hector and Isabel in C.C.'s presence, Isabel's substance abuse and mental health challenges, and it ordered reunification services.

---

[1] Statutory references are to the Welfare and Institutions Code.

2

In 2019, Hector was permitted unmonitored visits, and subsequently the juvenile court terminated jurisdiction and granted Hector and Isabel joint legal and physical custody of C.C.

B.      *The Present Dependency Petition*

In February 2022, C.C. was removed from his parents' physical custody and placed with maternal grandmother Faviola M. after domestic violence by Hector against Isabel witnessed by C.C.  The Department's section 300 petition alleged C.C. was at risk of serious physical harm due to:  Hector and Isabel's history of engaging in violent altercations in C.C.'s presence and Isabel's failure to protect by allowing Hector to reside with C.C.; Isabel's substance abuse and Hector's failure to protect by allowing Isabel to reside with C.C.; Hector's substance abuse and Isabel's failure to protect; and Isabel's mental health diagnoses of major depression and anxiety, history of self-harming behaviors and involuntary hospitalization, and failure to take medication.  (§ 300, subds. (a) & (b).)[2]  The juvenile court detained C.C. from both parents with monitored visitation.

At the jurisdiction and disposition hearing, the juvenile court dismissed the substance abuse count as to Hector and sustained the remaining allegations.  The court removed C.C. from Hector and Isabel's custody, ordered reunification services and continued monitored visitation for both parents, and ordered Hector to complete programs of domestic violence, random drug testing, and individual counseling.

---

[2]      In 2022, the Legislature amended section 300 (Stats. 2022, ch. 832, § 1), effective January 1, 2023, but the changes do not affect our analysis.

C.    *The Six-month Review Hearing and Report*

At the six-month review hearing, the juvenile court found "the parents are not yet in substantial compliance with the case plan.  They each have made partial progress."  Hector had completed a two-month drug rehabilitation program and enrolled in individual counseling and a domestic violence program, but did not consistently participate in court-ordered programs or drug testing.  Hector had also been charged with vandalism in June 2022, was arrested in August 2022 on an outstanding warrant for the vandalism charge after Isabel called the police when Hector refused to exit her car, and he was arrested in October 2022 for driving without a license and possession of drug paraphernalia.

The Department reported Hector had weekly monitored visits with C.C., who enjoyed visiting Hector.  Hector's nurturing behavior during visits was positive, and C.C. counted down the days until his next visit.  C.C. also reported Hector was sometimes "'angry'" and yelled during the monitored visits.  The Department further reported C.C. formed a strong bond and attachment to Faviola.  C.C. had behavioral challenges and a speech impediment, and Faviola had enrolled C.C. in special education classes, therapy, and speech services.  C.C. was comfortable and adjusted well to living with Faviola, and he benefited from the stability and consistency she provided as well as a home free from violence and substance abuse.

D.    *The 12-month Review Hearing and Report*

At the 12-month review hearing, the juvenile court found Hector's progress was "minimal" in his court-ordered programs, and noted he had been arrested in February 2023 for possession of narcotics.  Hector missed seven drug tests, and he stopped

attending his domestic violence program after completing 27 of 52 sessions. Isabel reported Hector continued his domestic violence against her and he threatened her with a gun. Isabel then obtained a temporary restraining order against him.

The Department reported C.C. continued enjoying monitored visits with Hector. Hector visited C.C. on weekends from 10:00 a.m. to 6:00 p.m. and took C.C. to baseball practice. Hector had a positive nurturing relationship and attachment with C.C., but the Department had concerns about his "reactivity and not being mindful of the child's presence during visits," including "vent[ing]" his anger and frustration toward Faviola in front of C.C. Hector requested C.C. be removed from Faviola's home but subsequently stated he believed C.C. was safe and well-cared for there. C.C. made "good progress" in Faviola's home. He was comfortable and improved in speech and language development and was receptive to boundaries and redirection. Faviola took bonding leave from work to spend more time with C.C. and volunteered at his school.

E. *The 18-month Review Hearing and Report*

At the section 366.22 hearing, the juvenile court found the Department had provided Hector and Isabel with reasonable reunification services but "[t]he parents haven't progressed. They seem to be sort of stuck where they were when the case first came in." The parents had ongoing contact with each other in violation of the temporary restraining order, and the Department noted Hector's "explosive" behavior and lack of insight had not improved. Hector continued to miss drug tests, had not completed individual counseling, and had yet to complete his domestic violence program.

5

Hector maintained monitored visitation with C.C. once or twice a week, occasionally including overnight visits, and C.C. reported being happy during visits. Hector expressed frustration and acted out when visitation requests did not go his way, such as canceling an overnight weekend visit and yelling at the social worker after he was unable to keep C.C. longer due to a social worker visit.

Faviola stated she was hesitant about adoption but was committed to providing permanency for C.C. if his parents could not reunify. C.C. reported feeling safe and happy in Faviola's care, and the Department reported he was well-adjusted to the household. C.C.'s speech greatly improved and he had decreased tantrums and behavior problems at school. The Department attributed C.C.'s improved development to the consistent schedule, stability, and positive environment provided by Faviola. C.C. continued to worry about Hector and Isabel "fighting" even though he had not recently witnessed any incidents of violence. The Department recommended a permanent plan of legal guardianship, but opined it was in C.C.'s best interest to be adopted.

The juvenile court ordered Hector's reunification services terminated and set a section 366.26 permanency planning hearing.

In its next report, the Department reported Faviola was committed to adoption and recommended terminating parental rights so C.C. could be adopted. And in its final report before the section 366.26 hearing, the Department reported Faviola remained committed to adoption, and C.C. remained well-adjusted and had progressed emotionally and developmentally. Hector's monitored visits with C.C. continued to go well, but

sometimes C.C. did not want to visit Hector, and Hector "took offense" and pressured him to visit.

F.     *The Section 366.26 Hearing Terminating Parental Rights*

At the section 366.26 hearing, C.C.'s counsel asked the juvenile court to terminate Hector's and Isabel's parental rights, which both parents opposed.  Hector asked the court to apply the beneficial parental relationship exception and to return C.C. to his custody or, alternatively, order a permanent plan of guardianship.

Hector testified to his consistent visits and positive bond with C.C., describing activities they would do together.  Hector described his relationship with C.C. as "easy going, nurturing. I'm finally beginning to start knowing that my son loves me and that my son knows that I love him back."  Hector acknowledged he had not participated in C.C.'s school activities other than baseball.

As to Hector's parental rights, the Department and C.C.'s counsel conceded the first element of the three-element test under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) was met because of Hector's consistent visits.  They also argued that Hector and C.C. had a "friendly" bond.  But they both argued the third prong was not met because any detriment to C.C. of terminating that relationship with Hector was outweighed by the benefits of adoption.  C.C.'s counsel argued C.C. had been removed from Hector's custody for several years, Hector and Isabel had ongoing contact despite a restraining order, and C.C.'s speech, reading, and special education needs had all improved under Faviola's care, with Faviola taking on the role of a parent. C.C.'s counsel further argued the bond between Hector and C.C.

7

was like that of a "relative or uncle" with Hector "doing more of the fun things," and that it did not outweigh the benefits to C.C. of adoption.

The Department also argued that the bond between Hector and C.C. was more of a "friendly relationship" that centered on Hector purchasing C.C. gifts rather than a strong parental bond. The Department recognized that such a parental presence had "some benefit" to a child, but the ongoing instability of Isabel and Hector's relationship negatively affected C.C., as did Hector's drug abuse, and that the security of a permanent adoptive home "far outweighs any benefit conveyed by a friendly relationship and visits with [Hector]."

Hector's counsel asserted that the relationship between Hector and Isabel was not relevant to the nature of the bond between Hector and C.C., or to the analysis of whether it was detrimental to sever that bond. Counsel further argued the Department's own reports reflected that C.C. would be negatively impacted if his parental bond was severed.

The juvenile court stated that it adopted the arguments made by C.C.'s counsel and the Department. The court agreed Hector met the first *Caden C.* element through consistent visits. The court stated it needed to consider the nature of their bond and found as follows as to the second and third *Caden C.* elements: "Father has a relationship with his son. The relationship appears to be more of the friendly relationship of an uncle-type relationship. Father would like it to be more, but he can't progress beyond [monitored visitation] because of his own conduct, so he can't deepen that bond. There is always some loss—in most cases where a parent is still in a child's life, . . . but I weigh that against the stability and depth of the relationship

8

that an adoption brings, which, here, it would—it clearly outweighs the benefit of the relationship with father because [Faviola] has really enriched this child's life by making sure he gets the services he needs and the stability he needs. I do not see that this case stands out as to the many . . . other cases where parents maintain regular contact. They are able to be fun parents during a visit, but there is not much more than that . . . it does not outweigh the benefits of adoption."

The juvenile court ordered Hector's and Isabel's parental rights terminated and designated Faviola as C.C.'s prospective adoptive parent.

Hector timely appealed.

## DISCUSSION

A.    *Governing Law and Standard of Review*

The purpose of a section 366.26 selection and implementation hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) "If the court has decided to end parent-child reunification services, the legislative preference is for adoption." (*In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 780; accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["if the child is adoptable . . . adoption is the norm"]; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [state has a "compelling" interest in "providing stable, permanent homes for children who have been removed from parental custody" and reunification efforts have been unsuccessful].)

"When the court finds . . . the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of

six enumerated exceptions applies." (*In re Elizabeth M., supra,* 19 Cal.App.5th at pp. 780-781; § 366.26, subd. (c)(1)(B); see *In re Celine R., supra,* 31 Cal.4th at p. 53; *In re Matthew C.* (1993) 6 Cal.4th 386, 392.)

The beneficial parental relationship exception allows the court to order a permanent plan other than adoption if a parent demonstrates, by a preponderance of the evidence, that "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra,* 11 Cal.5th at p. 631; § 366.26, subd. (c)(1)(B)(i).)  It applies only in "'exceptional circumstances." (*Caden C.,* at p. 631; accord, *In re Celine R., supra,* 31 Cal.4th at p. 53.)

We apply a "hybrid standard of review" to the beneficial parental relationship exception.  (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 317; see *In re I.E.* (2023) 91 Cal.App.5th 683, 691.)  The first two elements are reviewed for substantial evidence.  (See *Caden C., supra,* 11 Cal.5th at pp. 639-640.)  "[W]e presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  As a reviewing court, we do "'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.]  The determinations should 'be upheld if . . .  supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'" (*Caden C.,* at p. 640.)

As for the third element, we review factual determinations for substantial evidence and review the "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent . . . for abuse of discretion." (*Caden C., supra,* 11 Cal.5th at p. 640; see *In re I.E., supra,* 91 Cal.App.5th at p. 691.) "A court abuses its discretion when it '"has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination"'" or when it "rest[s] a disposition on an error of law." (*In re M.G.* (2022) 80 Cal.App.5th 836, 848-849; see *Caden C.,* at p. 641; *In re Charlisse C.* (2008) 45 Cal.4th 145, 159.)

B.  *The Juvenile Court Did Not Abuse Its Discretion in Concluding Hector Failed To Establish the Beneficial Parental Relationship Exception to Adoption*

Hector argues that a legal guardianship with Faviola would better serve C.C.'s interests rather than adoption and termination of his parental rights. As noted, it was Hector's burden to establish all three elements required for the parental relationship exception to apply in this case. (See § 366.26, subd. (c)(1)(B)(i); *Caden C., supra,* 11 Cal.5th at p. 636.)

1.  *Regular Visitation and Contact*

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra,* 11 Cal.5th at p. 632.) The parties agree, as do we, that Hector met the first element. The juvenile court found at the section 366.26 hearing that Hector maintained

regular visitation and contact with C.C. during the dependency proceedings.  Substantial evidence supports the court's finding the first *Caden C.* factor was satisfied.

2.     *Beneficial Relationship*

The second prong of the beneficial parental relationship exception has two components:  the child has a positive emotional attachment to the parent, and the child would benefit from continuing the relationship.  (See *Caden C., supra,* 11 Cal.5th at p. 636.)  Factors the court may consider include "'[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'"  (*Id.* at p. 632; see *In re Katherine J., supra,* 75 Cal.App.5th at p. 317.)  Here, the juvenile court found that Hector had a "friendly relationship" with C.C. that was akin to "an uncle-type relationship," and that there was some benefit to C.C. of having a "fun parent[] during a visit but there is not much more than that."  Substantial evidence supports those findings.

Hector's weekly monitored visits with C.C. over approximately two years of dependency proceedings were consistent, friendly, and mostly nurturing.  But even assuming a positive emotional attachment, the record contains evidence that the benefits to C.C. of continuing a parental relationship with Hector did not extend beyond a friendly bond.  As the juvenile court noted, eight-year-old C.C. had spent much of his life out of Hector's custody.  He had been removed from Hector's custody between January 2018 and December 2019, and had lived with Faviola from February 2022 through March 2024.  Hector did not progress to unmonitored visits to deepen his bond with C.C.,

12

despite two years of services. However pleasant their visits may have been, the record also reflects negative effects of their interaction. Hector was sometimes "angry" and yelled during visits, and Hector inappropriately expressed anger and frustration with Faviola in front of C.C. Sometimes C.C. did not want to visit, and Hector pressured him to visit. Hector also acted out to C.C.'s detriment when visitation requests did not go his way, such as canceling an overnight visit when Faviola stated he could not keep C.C. past 4:00 p.m. the following day.

C.C. also had special behavioral and developmental needs, including speech development challenges, special education needs, tantrums and behavioral issues at school. C.C., who had previously witnessed domestic violence between his parents, also continued to worry about Hector and Isabel "fighting." Hector admitted he had not been involved with C.C.'s schooling or individualized education program, and remained in a relationship with Isabel where he inflicted domestic violence upon her. Substantial evidence supports the court's finding Hector did not satisfy the second *Caden C.* factor.

### 3. *Detriment from Termination*

The final prong of the beneficial parental relationship exception is whether the stability and permanence that C.C.'s adoption would bring were outweighed by the harm to C.C. that would be caused by terminating his parental relationship with Hector. (See *Caden C., supra,* 11 Cal.5th at pp. 633-634.) As stated, the statutory preference in a permanency hearing for a dependent child is adoption. (*Id.* at p. 631 ["the norm . . . remains adoption"]; accord, *In re Celine R., supra,* 31 Cal.4th at p. 53.) When the benefits of a stable, adoptive, permanent home

13

outweigh the harm the child would experience from the loss of a continued parent-child relationship, the juvenile court orders adoption.  (See *Caden C.,* at p. 634.)

The juvenile court concluded that the benefits of consistency and stability in the adoptive home of Faviola outweighed the termination of C.C.'s relationship with Hector. There was substantial evidence supporting the court's findings that C.C.'s needs were well met in his adoptive placement and that Faviola "has really enriched this child's life by making sure he gets the services he needs and the stability he needs."  This evidence included:  C.C. had been living with Faviola for over two years and was strongly bonded with her; Department reports that C.C. benefited from the stability, consistency, and positivity in Faviola's home, and from a home free of domestic violence and substance abuse; C.C.'s special needs, which Faviola met through special education, speech services, and therapy and which resulted in significant progress for C.C.; Faviola setting boundaries and redirecting C.C.; as well as her bonding leave to spend more time with C.C. and volunteer at school to observe his behavior in class.

Hector argues that the court abused its discretion because C.C.'s primary parental attachment was to him rather than Isabel (due to Isabel's mental health rendering her incapable of consistent or appropriate interactions), and that the Department's initial recommendation of guardianship was a "tacit admission" he had a beneficial relationship with C.C. that would be detrimental to sever.  He also highlights the Department's assessment that C.C. was attached to Hector, its report that "severing ongoing contact with [C.C.'s] parents would cause emotional instability and preoccupation," and Faviola's

14

statement that C.C. would be negatively impacted if his contact with Hector ceased.

The parties agree C.C. would be negatively impacted if all visitation with Hector stopped.[3]  But that is not the end of the analysis.  *Caden C.* instructs juvenile courts to determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. . . .  [T]he effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression."  (*Caden C., supra,* 11 Cal.5th at p. 633.)  On the other hand, "a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental."  (*Ibid.*)  Here, the record supports the juvenile court's determination that the benefit and security provided by C.C.'s placement with Faviola outweighed the harm that would be caused by the loss of his relationship with Hector.  (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1158-1159 [affirming finding beneficial parental relationship exception did not apply where father regularly visited daughter and developed beneficial bond with her, but she viewed father as "'a fun, friendly person' to have visits with," not a parental figure].)

---

[3]  Although Faviola previously stated Hector could continue visiting C.C., the juvenile court emphasized it would make its decision assuming all visitation and contact would end once parental rights were terminated.  (See *Caden C., supra,* 11 Cal.5th at p. 633 ["courts must assume that terminating parental rights terminates the relationship."].)

15

In some cases, as here, "a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C., supra,* 11 Cal.5th at p. 634.) Under the abuse of discretion standard of review, we determine whether the juvenile court's decision exceeded the bounds of reason; in so doing, we cannot substitute our view for that of the juvenile court. (See *id.* at p. 641; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) In light of the evidence before the juvenile court, its determination that Hector did not satisfy the third *Caden C.* factor—because the benefits to C.C. of adoption by Faviola outweighed the harm to C.C. of terminating his parental relationship with Hector—was arbitrary, capricious, or otherwise an abuse of discretion.

## DISPOSITION

The juvenile court's order terminating Hector's parental rights is affirmed.

MARTINEZ, P. J.

We concur:

SEGAL, J.                         FEUER, J.

16